BEAVER LAKE ASSOCIATION, APPELLANT, V.
COUNTY BOARD OF EQUALIZATION OF
CASS COUNTY, AND CASS COUNTY, APPELLEES.

313 N.W.2d 673

Filed December 28, 1981.   No. 43509.

Herbert J. Elworth of Casey & Elworth for appellant.

Ronald D. Moravec, Cass County Attorney, for appellees.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

Beaver Lake Association, a Nebraska corporation (Association), filed a protest with the Board of Equalization of Cass County (Board), complaining of an erroneous assessment for the years 1978 and 1979 of certain "common areas" owned by the Association. These areas are located within Beaver Lake Development, sometimes referred to as Beaver Lake Subdivision, in Cass County. The protest was denied on appeal to the District Court for Cass County which found that the Association had failed to sustain its burden of showing that the values as finally determined by the Board were arbitrary, unlawful, discriminatory, unjust, or unfair, and affirmed the action of the Board. The Association has appealed to this court, assigning that action of the District Court as error. We affirm.

In deciding this case, we must be governed by several well-established legal principles. The trial of an appeal from a county board of equalization involving the valuation of real estate both in the District Court and the Supreme Court is de novo as an equitable proceeding. *Gradoville v. Board of Equalization*, 207 Neb. 615, 301 N.W.2d 62 (1981). For purposes of taxation, the terms actual value, market value, and fair market value mean exactly the same thing. *Gradoville, supra.* There is a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action, which presumption remains until there is competent

evidence to the contrary. Such presumption disappears when there is competent evidence on appeal to the contrary, and from that point on the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon evidence, with the burden of showing such valuation to be unreasonable resting upon the appellant on appeal from the action of the board. *Gradoville, supra.* The burden which the appellant must carry in order to be successful on appeal is to demonstrate by the evidence " 'that the assessment is grossly excessive and is a result of arbitrary or unlawful action, and not a mere error of judgment. . . . It is only where such assessed valuations are not in accordance with law, or it is made to appear that they were made arbitrarily or capriciously, that courts will interfere.' " *Id.* at 618, 301 N.W.2d at 64.

It is the Association's contention that the common areas are dedicated to the exclusive use and enjoyment of the lot owner members, which burden of use deprives those areas of any market value, and that any value which once existed in those areas has been absorbed by and included within each individual lot. Therefore, the Association reasons, the actual value of these common areas, within the meaning of Neb. Rev. Stat. § 77-201 (Reissue 1976) and as defined by Neb. Rev. Stat. § 77-112 (Reissue 1976), is at best nominal. It has suggested valuations of approximately 10 percent of those figures set by the Board.

According to the briefs of the parties, Beaver Lake Development is a subdivision of approximately 600 acres in rural Cass County, containing some 2,000 residential lots and certain common areas consisting of a 325-acre lake basin and dam, certain roads, water and sewage treatment plants and distribution and collection systems, a clubhouse, and recreational use sites. The Association is a not-for-profit corporation organized by the original developer of Beaver Lake Subdivision in 1970. Its purpose generally, as expressed in the articles of incorporation, is to "acquire . . .

operate . . . and maintain utility and recreational facilities . . . and otherwise to provide for the . . . interests of its members . . . ." Membership in the Association consists generally of residential lot owners and members of their families.

According to the testimony of Dennis Madigan, the president of the Association, dues are collected from each member to enable the Association financially to accomplish its functions. These functions include the maintenance and policing of interior roads and the lake and recreation areas, as well as all property owned by the Association. All of this property, the so-called "common areas," was purchased by the Association from the U.S. National Bank in April of 1977 for the sum of $662,500. It was also his testimony that the common areas belong to all of the lot owners jointly with no authority on the part of the Association to sell any of such areas. This was expressed as an opinion based on the stated purposes for organization contained in the articles of incorporation, a portion of which is quoted above. However, on cross-examination, he stated he guessed that the title to these properties was in the Association, but that it was his understanding that these common areas were for the exclusive and sole use of the lot owners.

The only evidence of the restriction on the use of the common areas, other than the testimony of the witnesses, must be found in the articles of incorporation and the bylaws of Beaver Lake Association, a standard form of membership agreement, and a lot purchase agreement utilized in the sale of building lots from the Association to the member owners.

We have previously referred to the purpose of the corporation set forth in the articles of incorporation, which is to acquire and maintain recreation facilities for the interests of the members. The only section of the bylaws cited by the Association as relating to the use of facilities is section 9. This provides in part that "all . . . Members . . . shall be entitled as appropriate to

enjoy or otherwise to use and benefit from all common facilities . . . operated or provided by the corporation." Each member is required to pay dues as from time to time may be determined by the board of directors.

By the terms of the membership agreement, the lot owner members are required to pay annual dues for maintenance and operation of the common facilities. Members also are to recognize that the rules and regulations pertaining to the Association may be amended from time to time by the directors as provided in the bylaws. The agreement further provides that the members understand that the Association is the owner of the roads, water and sewer facilities, lake, and other Association facilities.

Finally, the lot purchase agreement provides: "Use of the lake shall be subject to the rules and regulations of Beaver Lake Association. Seller [Association] reserves the use of the lake and other facilities for its corporate purposes without limitation." The Association also retains authority to amend or revoke the restrictions and conditions in whole or in part.

Counsel for the Association, in his questioning of William Otis, a witness as to values, suggests that the common areas are burdened with the perpetual use by the lot owners. We might agree that undoubtedly it was the understanding of the lot owners, and it may very well have been the intention of the developers and sellers of the lots, that such was the case. Nevertheless, no grant of such an easement to or title in such common areas appears of record as having accompanied the conveyance of each lot.

The evidence as to valuations of the common areas is contained in the testimony of Boyd Roberts, who does the evaluation work for Cass County; Carl Howe, a real estate broker who sells lots in Beaver Lake Subdivision; William Otis, a real estate appraiser from Omaha; and Gerald Ault, the Cass County assessor.

Mr. Roberts, when questioned by counsel for the Association, simply stated that in his opinion the

figures of $161,970 as the assessed valuation of the "common properties" for the year 1978, and $404,595 for 1979, were very conservative. Considering that these figures represent 35 percent of actual value, these compare favorably with the full valuations of $554,525.40 and $1,157,141.70, respectively, placed on these properties by the county assessor, which were affirmed by the Board and the District Court.

Mr. Howe stated that the lot owners did not acquire any title interest in the common properties, but that each was entitled to the exclusive use of the lake as an owner. Although expressing no opinion as to value of the common areas, he left the suggestion that such areas have no value because the "total value of the lake is assessed on the total of the lots."

The expert appraiser, Mr. Otis, proceeded on the assumption that the lake and common areas were reserved to the exclusive use of the members of the Association. He recited the seven statutory criteria for determining values, i.e., earning capacity, relative location, desirability and functional use, reproduction cost less depreciation, comparison with other properties, market value in the ordinary course of trade, and existing zoning of the property. It was his opinion that, based upon those factors, the value of Beaver Lake Subdivision was with the lots, and that he did not ascribe any market value to the common areas. That was because 100 percent of the use of these areas was reserved to the lot owners; therefore, the value of the common areas was reduced by 100 percent. Finally, it was his opinion that the valuations of these common areas for tax purposes would be nominal only, and he gave as his opinion that the fair valuations at the most would be 10 percent across the board of the valuations actually fixed by the Board. He stated that the fact that the Association had actually paid $662,000 for these areas in 1977 would "not necessarily" affect his thinking as to the fair tax value. He did concede that if the Association were to sell the common areas

there would be a basis for a value, but that he could not imagine anyone paying for these areas because they are without marketability.

Finally, Mr. Ault, the county assessor, testified that he had placed a value of $500 per acre on all common areas, plus the value of any personal property located thereon. This was the same value that was placed on all recreation areas in the county. Mr. Ault also testified that he had examined almost every deed of record to the lots in this subdivision and none of them indicated that the purchaser acquired any legal interest in the common areas. He concluded his testimony on direct examination by counsel for the Board by stating that the valuations placed on these common areas by his office and the Board were just and proper.

Counsel for the Association brought out, on cross-examination of Mr. Ault, that a residential subdivision in Cass County called Copper Dollar Cove had a privately owned lake and that it was leased to the property owners for a base rent of $34,250 per year. The witness then stated that the $500 per acre figure for recreational land, to the best of his knowledge, was established by the State of Nebraska in guidelines to be used by counties in eastern Nebraska. When questioned further, Mr. Ault admitted he could not quote the exact guideline or letter setting forth the $500 per acre value.

We are able to draw several conclusions of fact from the evidence which we have set forth above. The Association members are entitled to use the various common facilities, including the lake, and although such use is not designated as exclusive, there are no provisions in any of the documents permitting others this same privilege. However, the Association reserves the use of the various facilities for its corporate purposes without limitation, and is the owner of such facilities. There is no prohibition on the sale of the common areas and no restriction on the uses to which

they may be put, such sale or modified use being subject only to the approval of the board of directors or the membership. The likelihood of such sale or change in use to the detriment of the members is highly unlikely. However, there is nothing to prohibit the Association from concluding that it would be in the best interests of its membership to sell the common areas and lease them back for an annual rental similar to the arrangement existing with regard to Copper Dollar Cove.

We find it necessary to examine in some detail a number of cases cited by the Association in support of its position.

*Depart. of Revenue v. Morganwoods Greentree, Inc.,* 341 So. 2d 756 (Fla. 1976), involved the taxation of common areas in a townhouse development. While the developer retained the title to the common areas similarly to the present situation, those areas were held "subject to the declaration which grants to each resident lot owner *express easements* for recreation, ingress and egress, lateral support, and vehicular parking." (Emphasis supplied.) *Id.* at 757. The Florida court concluded that the common areas were an "integral part of the residential units," *Id.* at 759, and therefore a proper assessment would be achieved when "the assessed value of the individual units and the assessed value of the common areas equal the total just value of the lands and improvements comprising the total project." *Id.* at 758. The presence of the express easements restricting the title to the common areas distinguishes *Morganwoods* from the present action.

A somewhat closer question is presented by the case of *Matter of Crane-Berkley Corporation v. Lavis,* 238 App. Div. 124, 263 N.Y.S. 556 (1933). There a development contained two parcels of land designated on plat maps filed with the village for parks and playgrounds. The deeds to the purchasers of the lots within the development contained the following

language: " 'The fee of the two parcels of land marked "Park" on the said map is reserved by the Crane-Berkley Corporation, the party of the first part hereto, and is not conveyed to the party of the second part. These two parcels of land so marked "Park" shall be restricted by the party of the first part for park purposes and for such other outdoor recreational and similar purposes as the Crane-Berkley Corporation may from time to time determine as proper uses thereof . . . .'" *Id.* at 126, 263 N.Y.S. at 559.

The New York court agreed with the developer that it did not retain any beneficial interest in the parklands and therefore could not be taxed thereon. The court based its determination upon the fact that the developer was "estopped for all time from denying to its grantees the use and enjoyment of the parks in the development as shown on its [recorded] plan." *Id.* at 127, 263 N.Y.S. at 560. Compare this with the language found in the lot purchase agreement furnished by the Association here, "Seller reserves the use of the lake and other facilities for its corporate purposes without limitation," and the membership agreement, "Understanding that the Association is . . . the owner of the roads, water and sewer facilities, lake . . . ." It is clear that this latter language is significantly less restrictive since the Association may use the common areas for "its corporate purposes *without limitation.*"

Another case cited by the Association is *Supervisor of Assess. v. Bay Ridge,* 270 Md. 216, 310 A.2d 773 (1973). However, the distinguishing feature of that case is that the deeds to beachfront lot owners expressly granted the owners either access and right-of-way to the beach or the right to prohibit any building on the beachfront by the developer or subsequent owner.

In upholding the contention of the trustees of an estate that the parkland owned by them was not

marketable and therefore possessed no taxable value, the New Jersey Superior Court, Appellate Division, noted that "the terms of Mr. Allison's will and the legal history of the trust make it most doubtful that any sale of park land for ordinary business or residential use would ever be approved by the courts, no matter how large a price might be offered by the prospective buyer." *Englewood Cliffs v. Estate of Allison*, 69 N.J. Super. 514, 523, 174 A.2d 631, 636 (1961). The same cannot be said with regard to the terms contained in the documents now before this court.

Two developments, which included golf courses, sought to be valued for tax purposes were involved in *Tualatin Development v. Dept. of Rev.*, 256 Or. 323, 473 P.2d 660 (1970), and *Twin Lakes Golf Club v. King County*, 87 Wash. 2d 1, 548 P.2d 538 (1976). In the former case, in finding that the golf course had no value and therefore was not taxable, the Oregon court noted that the developer could never sell the course free of the zoning restrictions wherein the course was designated an "open area," and even if it could, the lot owners could claim estoppel to prevent such alteration due to the representations made to the purchasers of the lots as to the character and use of the land. In *Twin Lakes*, there was a reference in the deed to each lot owner that they would have a right to use and enjoy the golf course. No such restrictive zoning ordinance or deed provision has been brought forward in the present action.

*Bd. of Review v. Property Tax Appeal Bd.*, 91 Ill. App. 3d 117, 414 N.E.2d 173 (1980), involved a fact situation almost identical to the issue now before this court. The taxing authority attempted to assess the value of a lake owned and maintained by a property owners' association for the exclusive use of its members. The deed of the lake property to the association contained a reverter clause which would be activated if the association sold the lake, ceased its corporate activi-

ties, or allowed nonmembers to use the lake.

In response to the claim that the reverter clause rendered the lake unmarketable, the court noted that the statutes required all land to be taxed at "fair cash value" and responded, "This standard presupposes that the property is available for sale on the market and that there are buyers interested in purchasing it; it does not, however, permit an assessing body to give consideration to legal restrictions on the use of the property or infirmities in the title of the taxpayer." *Id.* at 121, 414 N.E.2d at 176.

In response to the second contention, that the lots adjoining the lake absorbed any value the lake might have had, the court replied as follows: "It is apparent that property adjoining or in close proximity to a body of water, a park, golf course or other scenic view may well have an increased value because of its location. However, there is no assessment principle in Illinois which provides that the assessed value of the scenic property may itself be correspondingly reduced because of its effect on surrounding property." *Id.* at 122, 414 N.E.2d at 176. Similarly, this court is unable to find such an assessment principle in Nebraska.

The grant of use privileges claimed by the Association in favor of the lot owners in the common areas lacks sufficient formality, definition, and duration of creation to constitute valid restrictions. As a result, the premise upon which the Association's witnesses based their opinions, that 100 percent of the value of the common areas had evaporated, is unsound and the conclusions unwarranted. Accordingly, the Association is left with no competent evidence with which to refute the presumption of regularity enjoyed by the Board in making its assessment.

The judgment of the District Court is correct and is affirmed.

AFFIRMED.

McCown, J., concurs in the result.