[No. 52526–9.   En Banc.   April 23, 1987.]

SAHALEE COUNTRY CLUB, INC., *Petitioner*, v. THE
BOARD OF TAX APPEALS, ET AL, *Respondents.*

*Michael A. Jonson, Jonson & Jonson, P.S., John Piper,*
and *Bogle & Gates,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Sandra L.
Cohen, Deputy,* for respondents.

DURHAM, J.—The Sahalee Country Club has appealed
from a decision by the Board of Tax Appeals (Board) valu-
ing its golf course at $3.1 million for tax purposes. The val-
uation of golf courses and similar open spaces has
apparently been the source of some controversy in this

state's tax tribunals since our opinion in *Twin Lakes Golf & Country Club v. King Cy.*, 87 Wn.2d 1, 548 P.2d 538 (1976). Today we reemphasize that the critical element of *Twin Lakes* is the subject property's market value. Any other factor is relevant only to the extent that it can be shown to affect market value. Because the Sahalee golf course was shown to have a fair market value of $3.1 million, we affirm the Board's decision.

The Sahalee golf course is owned by Sahalee Country Club, Inc., a nonprofit private corporation with 500 shareholding members. The club itself consists of a golf course, clubhouse, parking lots and other improvements. It occupies approximately 212 acres on a plateau east of Lake Sammamish. The course consists of 27 holes and is of championship quality. In fact, Golf Digest each year recognizes Sahalee as one of the best 100 courses in the country.

In this case, taxation of the course requires an understanding of the course's relationship to its surroundings. The golf course is an integral part of a residential community consisting of approximately 500 single family homes and condominiums. The community almost completely surrounds the course. The lots were sold with the promise that the golf course would remain in perpetual existence. Other than that promise, however, the lot owners have no control over the management of the club's property. Lot owners do not acquire any ownership of the course merely by owning a lot. Lot owners are treated no differently than the general public if they apply for membership in the club. There are no recorded restrictions on alienation of the club nor any restrictive covenants as to use of the course. Sale of the club would require no consent from surrounding lot owners. Lot owners cannot use the course for any purpose without joining the club.

The club's property is zoned for single family residential use, which includes use as a golf course. Although zoning regulations would allow converting the club's property to a residential subdivision, practical restrictions (such as the configuration of the course and the limited access) limit the

property to use as a golf course.

The King County Assessor appraised the club's fair market value at approximately $3.3 million for assessment years 1982 and 1983. Sahalee disagreed with this appraisal because it believed that its property value should be zero under principles outlined in *Twin Lakes*. In *Twin Lakes*, this court held that the Twin Lakes Country Club had zero value because legal restrictions in favor of neighboring landowners limited the property's use to that of a golf course, which use resulted unavoidably in financial loss. The King County Board of Equalization agreed with Sahalee's argument and valued its property at zero. The assessor appealed this decision to the Board of Tax Appeals. After hearing 2 weeks of testimony, the Board of Tax Appeals overturned the Board of Equalization's zero valuation and placed a $3.1 million value on the club's property. Sahalee sought judicial review in Thurston County Superior Court.[1] The case was then certified for direct review to the Court of Appeals and again certified from the Court of Appeals to this court.

Sahalee has presented an array of objections to the Board's valuation of its golf course. Some of these objections concern details of the Board's calculations, which if meritorious would require some adjustments in the Board's $3.1 million. These objections will be treated later in the opinion. Two of Sahalee's arguments, however, strike at the very heart of the Board's decision, seeking not an adjustment in the Board's valuation, but a decision that the golf course has no market value at all. Both of these arguments are based on *Twin Lakes*, to which we now turn.

---

[1] The assessor has also cross–petitioned for correction of two of the Board's factual assertions. We agree with the assessor's position. The Board's opinion refers to the course being "landlocked" by the residential community, although the record reveals that in two places the course abuts a county road. The Board also found that the course is not owned "to any large extent" by the surrounding lot owners as part of their lot ownership. This statement wrongly implies that ownership of a lot automatically includes some ownership of the golf course. The record shows that lot ownership by itself does not include any golf course ownership. In all other respects, we affirm the Board's factual findings.

INTERPRETATION OF TWIN LAKES

█ The starting point for real property valuation is RCW 84.40.030, which provides that all real property "shall be valued at one hundred percent of its true and fair value in money and assessed on the same basis unless specifically provided otherwise by law." *Twin Lakes* explained this language as follows:

> The words "true and fair value in money" have consistently been interpreted by our courts to mean "fair market value." *Bitney v. Morgan,* 84 Wn.2d 9, 14, 523 P.2d 929 (1974). "Market value means the amount of money which a purchaser willing, but not obliged, to buy would pay an owner willing, but not obligated, to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Mason County Overtaxed, Inc. v. Mason County,* 62 Wn.2d 677, 683–84, 384 P.2d 352 (1963). The market value of reality [*sic*] is to be measured by considering benefits to be garnered from the use of the property and the burdens placed upon it. Burdens are restrictions which may arise from zoning ordinances or other legal limitations on the use of land. *See Pier 67, Inc. v. King County,* 78 Wn.2d 48, 57, 469 P.2d 902 (1970).

*Twin Lakes,* at 4.

In *Twin Lakes,* we applied these general market value principles to the peculiar facts of that case. The Twin Lakes golf course was built as an integral part of a housing community. Covenants restricted the use of the golf course for the benefit of the lot owners in the development. Specifically, the property was restricted to use as a golf course and was additionally restricted as to its alienation. The golf course had consistently been operated at a financial loss and would continue to do so in the future. *Twin Lakes,* at 2–4. This court applied the familiar principle that real property's market value "is to be measured by considering benefits to be garnered from the use of the property and the burdens placed upon it." *Twin Lakes,* at 4. This court finally concluded that the Twin Lakes Golf Course had a zero market value because the use of the property was so restricted that its ownership was of no benefit or value.

*Twin Lakes,* at 5.

*Twin Lakes,* therefore, clearly states that the bottom line is market value. Therefore, to obtain a zero valuation, a taxpayer must show more than restrictions on the use of its property and a history of unprofitability; the taxpayer must also show that these factors deprive the property of all market value.

Sahalee argues that it should have a zero market value because the facts of its case are comparable to those in *Twin Lakes.* Sahalee points out that in each case, the use of a private golfing club was restricted in favor of neighboring residential lots, and in each case, the club was operated at a financial loss. The Twin Lakes Club was valued at zero, and Sahalee seeks the same. This argument has some initial intuitive appeal because a property should be valued at zero when its use is restricted to an operation that loses money. Sahalee's argument, however, has two flaws. As an initial matter, the record shows that Sahalee is not the financial problem it claims to be, but rather has an annual net operating income of over $100,000.[2] More importantly, however, Sahalee has ignored the key consideration here, *i.e.,* market value. The record clearly shows that Sahalee has market value despite the restrictions and the questionable profit history. First, similarly restricted golf courses around the western United States had significant market values. Second, a "sophisticated lender" took the property as security for a $925,000 loan in 1969. Third, expert testimony established that investors would be interested in the property if it were listed for sale. Those investors would be

---

[2]The parties disagree as to Sahalee's profit history because they are each measuring it differently. The assessor argues that Sahalee had an annual net operating income of between $140,000 and $230,000, after excluding depreciation and interest from expenses. The assessor's expert testified that this is the figure which is used by appraisers in determining value through income capitalization. Sahalee counters by arguing that the club's average annual net income was $23,000, which was more than offset by the $800,000 in deferred maintenance obligations which have accumulated in the last 10 years. Sahalee, however, has not presented any evidence to show the appropriateness of calculating income in this manner. We, therefore, find the assessor's evidence to be more credible.

able to change the operation of the course into a money-making venture, partially through expanding the number of its members. Given this market value evidence, the zero valuation of *Twin Lakes* certainly cannot apply to Sahalee.

Sahalee's second argument is that *Twin Lakes* is based on the theories of "shifting value" and "double taxation". Sahalee argues that its golf course increased the property values of neighboring residential lots by a total of $13 million, an amount far in excess of the cost of building the golf course. Sahalee contends that $13 million in value had shifted from the course to the residential lots, which would leave the golf course without value. Sahalee argues that taxing the golf course as well as taxing the residences for the additional $13 million would amount to double taxation. Under this argument, Sahalee focuses on the dollar amount of the benefit that accrues to the neighboring lot owners, not the dollar amount of the burden that this relationship places on the golf course.

This argument, however, misinterprets *Twin Lakes*. *Twin Lakes* did not mention the concepts of "shifting value" or "double taxation" in its analysis.[3] Rather, this court's analysis focused on the extent to which the golf course retained any market value, not on the extent to which neighboring properties were increased in value. While we agree that value sometimes is transferred from burdened to benefited properties, there is no necessary dollar–for–dollar correlation between the decrease in value of the burdened property and the increase in value of the benefited property. *See Borough of Englewood Cliffs v. Estate of Allison,* 69 N.J. Super. 514, 529, 174 A.2d 631 (1961); *Alvin v. Johnson,* 241 Minn. 257, 263, 63 N.W.2d 22 (1954). As Professor Bonbright pointed out:

---

[3]Although *Twin Lakes* did not mention these concepts, Sahalee argues that they form the basis for that decision. In support of this argument, Sahalee points out that the briefs in *Twin Lakes* discussed these concepts, and that our opinion relied on a case that discussed shifting value. *See Crane–Berkley Corp. v. Lavis,* 238 A.D. 124, 127, 263 N.Y.S. 556 (1933). Neither of these arguments is sufficient for us to imply into *Twin Lakes* concepts which were not necessary to its analysis.

One should note that there is no necessary equivalence between the damage a landowner suffers by being subjected to an easement and the benefit other land obtains from that easement. An easement of passage over *A*'s forest land to the road may greatly enhance the value of *B*'s hotel property without correspondingly depreciating *A*'s land; while on the other hand an easement of light over *C*'s lot may merely make *D*'s backyard slightly pleasanter while preventing *C* from building an apartment house.

1 J. Bonbright, *Valuation of Property* 497 (1937).

Although some older cases held that the increased value of benefited property was relevant in valuing the burdened property,[4] modern cases, such as *Twin Lakes,* have not used this analysis. These cases have expressly rejected such a theory. *See Beaver Lk. Ass'n v. County Bd. of Equalization,* 210 Neb. 247, 257, 313 N.W.2d 673 (1981); *Lake Cy. Bd. of Review v. Property Tax Appeal Bd.,* 91 Ill. App. 3d 117, 122, 414 N.E.2d 173 (1980).

We join in rejecting this theory. It erroneously focuses on the market value of neighboring properties rather than on the market value of the subject property. Once again, we must reiterate that the *Twin Lakes* focus is on the subject property's market value, not on other considerations. Other considerations, such as restrictions on property use, unprofitability, and neighboring property values, are relevant only insofar as they affect the subject property's market value. Given the independent evidence in the record establishing that Sahalee had some market value, the Board correctly rejected Sahalee's arguments for zero valuation.

Having determined that the Sahalee golf course had some market value, the Board next had to calculate the amount of that value, taking into account the appropriate benefits and burdens. In order to better explain the Board's decision, we will first outline some general principles of property valuation.

---

[4]*See People ex rel. Poor v. Wells,* 139 A.D. 83, 87, 124 N.Y.S. 36, *aff'd,* 200 N.Y. 518, 93 N.E. 1129 (1910), and to a far lesser extent, *Crane–Berkley Corp. v. Lavis,* 238 A.D. 124, 127, 263 N.Y.S. 556 (1933) (mentioning a shift in value).

GENERAL METHODS OF PROPERTY VALUATION

Real property is to be valued according to its "highest and best use", which is the most profitable, likely use to which a property can be put. WAC 458–12–330. In estimating the highest and best use, an assessor may consider the property's particular adaptation to a particular use. WAC 458–12–330; *Samish Gun Club v. Skagit Cy.*, 118 Wash. 578, 579–80, 204 P. 181 (1922).

Fair market value is determined by one or more of three general methods: market data, cost, and income capitalization. RCW 84.40.030(1), (2). The market data approach involves appraising property by analyzing sale prices of similar property. American Institute of Real Estate Appraisers, *Golf Courses: A Guide to Analysis and Valuation* 103 (1980) (AIREA). Of the three methods, the market data approach is the most reliable, as long as adequate data is available. B. Boyce & W. Kinnard, Jr., *Appraising Real Property* 199 (1984).

The second method, cost, can also take the form of cost less depreciation or reconstruction cost less depreciation. RCW 84.40.030(2). This approach estimates what it would cost a typically informed purchaser to produce a replica of the property in its present condition. B. Boyce & W. Kinnard, Jr., at 269. The cost approach usually involves adding an estimate of the depreciated reproduction cost of the property's improvements and buildings to an estimated value of the land if vacant. AIREA, at 104.

Finally, fair market value can be estimated through capitalization of income. Under this method, value is assumed to be approximately equal to the present value of the future benefits of property ownership. AIREA, at 106. Application of the appropriate annual rate of capitalization to the forecast of annual net income generates an estimate of that present value. B. Boyce & W. Kinnard, Jr., at 230.

The final step in the appraisal process is the reconciliation of the values determined through the different methods outlined above. Usually, more than one method is employed, even if only as a check on accuracy. These

methods usually produce a range of estimates. The appraiser calculates a final value estimate by placing greatest emphasis on the value generated by the method deemed to be most reliable. AIREA, at 107–08.

## THE BOARD'S VALUATION OF SAHALEE

The Board relied primarily on the assessor's cost analysis in valuing Sahalee's property, which was conducted as follows. The assessor first valued the site as if it had no improvements. This was done by looking at comparable bare land sales in the area. The assessor determined that the most comparable land sales, those with limitations on intensive developments, ranged in price from $6,500 to $7,500 per acre. Consequently, Sahalee's land was valued at $7,500. The assessor then valued the golf course improvements (e.g., fairways, greens, traps, etc.) by determining replacement cost estimates and subtracting all depreciation amounts. The assessor arrived at a value for the improvements of $56,000 per hole. The combined value of land and course improvements was $75,000 per hole. By adding together the values for the land, the course improvements, and the buildings,[5] the assessor arrived at a total value of $3.1 million. The Board accepted this figure with only minor changes.[6]

The assessor also used the market data approach in valuing Sahalee. This approach estimates property value by using the sales prices from sales of comparable properties. RCW 84.40.030(1). Comparable properties were determined to be those which were restricted, either legally or practically, to use as a golf course. Sales of such courses occur rarely; hence, the assessor had to look to sales occurring around the western United States. The most comparable sales ranged in adjusted sales prices from roughly $70,000

---

[5]The valuation of the buildings is not in dispute here. The parties agree on that aspect of the club's valuation.

[6]The assessor sought a value of $3,172,500, while the Board concluded that the value was $3,131,900.

to $140,000 per hole. Accordingly, the valuation of Sahalee at $75,000 per hole for land and improvements fits in at the lower end of this range. The Board used the market data approach only as a way of confirming the value determined under the cost approach.

The Board considered, but then rejected, the income capitalization method because capitalization of the meager income generated by golf courses usually does not accurately estimate their market value.

### SAHALEE'S OBJECTIONS TO ITS VALUATION

Sahalee maintains that the Board's valuation does not give sufficient consideration to the burdens imposed on the golf course. Sahalee's property was restricted in two ways to use as a golf course. First, the conditional use permit states that the land will be used as a golf course in perpetuity. Second, practical considerations such as the peculiar layout of its property and limited access also rendered unlikely other uses, such as residential development. However, the Board took this factor into consideration when it valued the golf course. Sahalee's bare land value was valued per acre at $7,500, rather than the $15,000 to $30,000 range which property capable of residential development was valued at. The lower figure reflects Sahalee's special limitation.

Sahalee argues that the income capitalization method should have been used. However, there are many reasons why this argument is unpersuasive. First, the income capitalization method is inappropriate when, as here, the subject property is not designed as a profit–making venture. *See Boise Cascade Corp. v. Pierce Cy.*, 84 Wn.2d 667, 677– 78, 529 P.2d 9 (1974); B. Boyce & W. Kinnard, Jr., at 436; *Encyclopedia of Real Estate Appraising* 614 (1959); AIREA, at 102, 107. Sahalee is a nonprofit corporation. Second, the cost approach is often the best one for estimating the value of special–purpose properties (those constructed to fit the peculiar needs of a particular occupant). B. Boyce & W. Kinnard, Jr., at 253. Country clubs are considered to be special–purpose properties. AIREA, at 28.

Third, the cost approach is particularly applicable where the property is being used at its highest and best use, as it was in the instant case. Finally, the Board generally uses the cost method to value golf courses, so its use in the present case is not arbitrary.

██ Furthermore, the assessor "should be afforded considerable discretion" in her choice of the proper valuation method(s). *Folsom v. County of Spokane,* 106 Wn.2d 760, 769, 725 P.2d 987 (1986); *Chief Seattle Properties, Inc. v. Kitsap Cy.,* 86 Wn.2d 7, 25, 541 P.2d 699 (1975); *King Cy. v. Department of Rev.,* 32 Wn. App. 617, 621, 649 P.2d 126 (1982). Given the superiority of the cost approach in the present case, the Board's use of it in valuing Sahalee's property certainly was not an abuse of discretion.

██ Sahalee also objects to the use of data from sales of golf courses throughout the western United States (specifically Arizona, California, Oregon and Washington) under the market data approach. Remember that the market data method involves examination of sales of similar properties. Sahalee argues that only similar properties in the immediate area should have been considered, and further, that sales of courses in "sun–belt" states are not relevant because those courses earn money all year. The Board concluded, however, that there is a nationwide market for golf course investments. Substantial evidence supports this conclusion, primarily the testimony of one expert as to large investment companies interested in golf courses throughout the western states. Furthermore, similar properties from outside the immediate geographical area can be used as a comparison if the number of similar sales in the immediate area is inadequate for analysis. WAC 458–12–301(1). The other properties need not be identical, but any differences should be taken into account, as they were in Sahalee's case. The sales figures of year–round courses in the sun–belt states were adjusted for a number of factors, including climatic and geographical differences, before they were used as a guide for Sahalee's valuation. Differences in the comparability of one property to another goes to the weight,

not the admissibility, of the sales data. *Chase v. Tacoma,* 23 Wn. App. 12, 17, 594 P.2d 942 (1979). The admission of comparable sales is within the trial court's discretion. *State v. Hobart,* 5 Wn. App. 469, 474, 487 P.2d 635 (1971). The use of out–of–state data did not represent an abuse of discretion.

Sahalee also objects to the properties used for comparison purposes under the cost approach. As discussed earlier, one step in the cost approach involves valuing the land as if it had no improvements. Sahalee argues that the properties used for comparison purposes in estimating the bare land's value were dissimilar. The Board, however, found them to be similar, and gave corresponding weight to those values depending on the relative degrees of similarity. Sahalee did not submit any data of its own with which to contravene the assessor's evidence. Substantial evidence, therefore, supports the assessor's valuation of Sahalee's bare land at $7,500. Furthermore, as shown above, the Board had discretion in admitting the comparable sales data, and that discretion was not abused.

Finally, Sahalee also argues that the evidence of one of the assessor's experts was flawed because he incorrectly assumed that the property had alternative uses, including residential subdivision. However, the expert's assumption, if error, is harmless because he found the property's highest and best use to be that of a golf course. Property is to be valued according to its highest and best use. WAC 458–12–330. Therefore, the expert's assumption about alternative uses could not have affected his ultimate appraisal value.

The Board's decision is affirmed.

PEARSON, C.J., UTTER, DOLLIVER, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., and HAMILTON, J. Pro Tem., concur.