**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
11/28/2022
Court of Appeals
Division I
State of Washington

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| PETROGAS PACIFIC LLC AND PETROGAS WEST LLC, | No. 83065-1-I |
| Appellants, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| REBECCA XCZAR, WHATCOM COUNTY ASSESSOR, | |
| Respondent. | |

MANN, J. — This appeal arises from the property tax valuation of a terminal and wharf owned by Petrogas Pacific LLC and Petrogas West LLC (Petrogas). Petrogas appeals the final decision of the Board of Tax Appeals (Board). Petrogas argues that the Board erred (1) by considering intangible characteristics of the subject properties, (2) by considering an aquatic lands lease in the property tax value, and (3) by rejecting Petrogas's appraisal. We affirm.

<u>FACTS</u>

A. <u>Purchase and Valuation</u>

Petrogas owns and operates a liquified petroleum gas (LPG) terminal and wharf near Ferndale, Washington. In May 2014, Petrogas acquired the terminal from Chevron

for $242,000,000. In September 2016, Petrogas acquired the wharf from Intalco Aluminum for $122,000,000.

The terminal provides storage and distribution of liquefied propane and butane to domestic and international markets. The terminal can export and import up to 30,000 barrels a day, has rail, truck, and pipeline capacity, and is connected to two local refineries. The wharf serves the LPG operation of the terminal and the aluminum smelting operation of Intalco. The wharf is built on aquatic lands within the Strait of Georgia and subject to an aquatic lands lease with the State of Washington. The aquatic lands lease allows 48 ships to dock at the pier per year, regardless of product. Ships unload alumina ore to supply the Intalco aluminum smelting plant and load LPG product from the terminal to ship overseas.

The purchases of the terminal and wharf were somewhat complicated by the arrangements currently in place and a third party right of first refusal. Because purchase of the terminal connected significantly with Petrogas's other assets and connections, Petrogas was motivated to bid very aggressively on the property. Yet Petrogas's counsel testified that the transaction was "typical of such a sale." In addition, during the 2016 purchase of the wharf, Petrogas agreed to an overpayment because the wharf was critical to the integrity of the terminal and Petrogas's export program as a whole.

After purchasing the terminal, Petrogas's independent auditors, Pricewaterhouse Coopers (PwC) conducted an appraisal and allocation. PwC's appraisal was conducted under U.S. general approved accounting practices (U.S. GAAP). Based on appraisals, PwC allocated $11,895,000 to land, $157,752,327 to the real property improvements

No. 83065-1-I/3

(Terminals/Tanks), and $2,772,500 to tangible personal property. PwC allocated the remaining amount of the price to intangible value.

After purchasing the wharf, Petrogas engaged an appraisal firm to assess the wharf's condition, which estimated repair costs of around $11 million, and obtained an appraisal concluding the fair market value of the wharf in its condition at the time of sale was $10,205,058. Petrogas allocated $10,205,058 to the wharf improvements, other smaller amounts to tangible personal property at the wharf, $100,000,000 to intangible goodwill, and $11,699,896 to the aquatic lands lease. Petrogas reported this allocation on the real estate excise tax affidavit. PwC reviewed and agreed to the allocation for the purposes of financial accounting under U.S. GAAP.

Once the Whatcom County Assessor[1] (Assessor) received notice of the terminal sale, it believed the property had been undervalued and began a review. During this review, the Assessor reviewed publicly available information on the industry to understand the "fundamentally dynamic changes that had been occurring" in the business. The Assessor found that demand from the Asian market had been increasing, while on the supply side, new reserves were being discovered. It also found that the highest and best use of the wharf was changing from its initial purpose to support Intalco's aluminum smelter to increasingly larger shipments of LPG.

For its 2016 valuation of the wharf, the Assessor relied on the sales information for the combined terminal and wharf for $364,000,000. After deductions for inventory,

---

[1] Rebecca Xczar is now the Whatcom County Assessor, but for the relevant valuation years, Keith Willnauer was the assessor.

No. 83065-1-I/4

intangible value, and others values, the Assessor valued the wharf at $182,725,099, and the terminal at $90,108,394.

In 2017, the Assessor requested an Advisory Appraisal from the Department of Revenue (DOR). DOR used all three valuation approaches—cost, income, and sales— to form a final opinion of market value. While the Assessor criticized aspects of the DOR appraisal, it used some of their documentation and methodology to conduct both a cost approach and an income approach to value Petrogas's property for 2017 and 2018. As a result, the Assessor valued the terminal at $190,710,788 for 2017 and $194,606,203 for 2018. The Assessor valued the wharf at $182,725,099 for 2016, $98,244,952 for 2017, and $100,251,680 for 2018.

Petrogas sought review of all five valuations before the Board.

B. Proceedings before the Board

The Board conducted a formal hearing over six days, hearing from seven witnesses. The Board admitted multiple exhibits from each party, including an appraisal report commissioned by Petrogas, a review of the appraisal submitted by the Assessor, and rebuttal reports.

Petrogas's appraisal report was conducted by Kevin Reilly, ASA, of evcValuation LLC. At the time of the report, there were only 10 LPG export facilities in North America, with several more planned or under construction. Petrogas's LPG terminal and wharf were the only operating LPG storage and export facility on the West Coast.

When Reilly considered all three of the traditional approaches to valuation, Reilly found the sales comparison approach and income approach not applicable to the valuation of the terminal and wharf. Reilly did not develop the sales comparison

-4-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

approach because Petrogas's purchase was the only known sale of an operating LPG terminal on the West Coast and "there are typically many details of [these] transactions that are not able to be discerned." In deciding not to develop an income approach to value, Reilly cited several challenges such as: limited historical financials, a limited number of comparable terminals to establish a regional market, related parties leading to unrecognized revenues and operating expenses, limited information to develop market-based throughput rates for the West Coast, and the overall highly proprietary nature of LPG terminal history.

Thus, Reilly only developed and applied the cost approach. Under the cost approach, Reilly concluded that both the 2018 and 2017 market values for the terminal were $157,000,000. Reilly also concluded the market values for the wharf were $17,000,000 for 2018, $16,000,000 for 2017, and $15,000,000 for 2016. The appraisal also concluded that "the highest and best use of the LPG Terminal and Wharf are their current uses as LPG export facilities."

The Assessor's review appraisal was conducted by Brent Eyre, ASA. Eyre's report criticized the Reilly appraisal in three main areas. First, Eyre argued that in analyzing the highest and best use for the properties, Reilly's cost approach, a summation of the value of the tangible real property as individual and independent assets, would not achieve the highest and best use as an integrated assets function. In contrast, under a unit appraisal, an integrated group of operating assets is valued as "one thing without reference to the independent value of the component parts."

Second, Eyre argued that Reilly should have included the value of the aquatic lands lease in assessing the overall value of the terminal and wharf. Third, Eyre

No. 83065-1-I/6

criticized Reilly's failure to consider and analyze the sale of the subject properties. This would have shown that considerable taxable value was missing from the cost approach and led Reilly to use a unitary valuation method. Eyre concluded, "these errors have led to an improper valuation of the subject property." The Board found Eyre credible.

The Board issued its final decision on June 29, 2021. While the Board found Reilly credible, it also found that Reilly "did not consider intangible characteristics including proximity to Asian markets, scarcity of LPG facilities on the West Coast, the aquatic lands lease, and the number of ships that can land at the wharf annually." The Board concluded that the Reilly appraisal erred by considering only the cost approach and not appropriately considering the subject sales nor any income approach valuation. And the Board concluded that Petrogas's contended values excluded attributes of the properties that were properly taxable. The Board concluded that the DOR and Assessor properly used unitary valuation methods and the Assessor's valuations were properly performed.

As a result, the Board upheld the Assessor's valuation of the terminal for 2017 and 2018. The Board also upheld the Assessor's valuation of the wharf for 2017 and 2018. The Board, however, adjusted the 2016 valuation of the wharf from $182,725,099 to $98,000,000. The assessed values, Petrogas's response, and the Board's decision are as follows:

| Assessment Year | Assessed Value | Petrogas's Appraisal | Board's Decision |
|---|---|---|---|
| **Wharf** | | | |
| 2016 | $182,725,099 | $15,000,000 | $98,000,000 |
| 2017 | $98,244,952 | $16,000,000 | $98,244,952 |
| 2018 | $100,251,680 | $17,000,000 | $100,251,680 |

-6-

No. 83065-1-I/7

| Terminal | | | |
|---|---|---|---|
| 2017 | $190,710,788 | $157,000,000 | $190,710,788 |
| 2018 | $194,606,203 | $157,000,000 | $194,606,203 |

Petrogas petitioned for review of the agency decision. Whatcom County Superior Court certified the case for direct review under RCW 34.05.518.

ANALYSIS

We review decisions by the Board of Tax Appeals under the Administrative Procedure Act (APA), ch. 34.05 RCW. Judicial review is limited to the agency record. RCW 34.05.558; see also Puget Soundkeeper All. v. Dep't of Ecology, 191 Wn.2d 631, 637, 424 P.3d 1173 (2018). Under the APA, we may grant relief from an agency's order based on one of nine reasons listed in RCW 34.05.570(3), including that the order is (1) based on an erroneous interpretation or application of the law, (2) not supported by substantial evidence, or (3) arbitrary or capricious. RCW 34.05.570(3)(d), (e), (i).

We review questions of law, statutory construction, and an agency's application of the law de novo. Puget Soundkeeper, 191 Wn.2d at 637. We review an agency's factual findings for substantial evidence, "asking whether the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true." Pac. Coast Shredding, L.L.C. v. Port of Vancouver, USA, 14 Wn. App. 2d 484, 501, 471 P.3d 934 (2020). We defer to the agency's broad discretion in weighing the evidence. Whidbey Envtl. Action Network v. Growth Mgmt. Hr'gs Bd., 14 Wn. App. 2d 514, 526, 471 P.3d 90 (2020). An agency's unchallenged findings of fact are verities on appeal. Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 244, 350 P.3d 647 (2015).

No. 83065-1-I/8

A. Consideration of Intangible Characteristics

Petrogas argues that the Board erred by including intangible personal property in the taxable value of the property. We disagree.

Statutory interpretation is a question of law reviewed de novo. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 9, 43 P.2d 4 (2002). The ultimate goal of interpretation is to determine and carry out the intent of the legislature. Campbell & Gwinn, 146 Wn.2d at 9. If possible, courts "must give effect to [the] plain meaning [of a statute] as an expression of legislative intent." Campbell & Gwinn, 146 Wn.2d at 9. Courts derive plain meaning from the context of the entire act as well as any "related statutes which disclose legislative intent about the provision in question." Campbell & Gwinn, 146 Wn.2d at 11. If a statute is unambiguous, courts need not consider outside sources. State v. Delgado, 148 Wn.2d 723, 717, 63 P.3d 792 (2003).

A statute is ambiguous when, after examination, "it is subject to more than one reasonable interpretation." City of Seattle v. Winebrenner, 167 Wn.2d 451, 456, 219 P.3d 686 (2009). Once a statute is subject to more than one reasonable interpretation, courts "may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." Christensen v. Ellsworth, 162 Wn.2d 365, 373, 173 P.2d 228 (2007).

All property must be valued at 100 percent of its true and fair value. RCW 84.40.030(1). True and fair value means market value and is the amount of money a buyer would pay a seller, taking into consideration all uses to which the property is adapted. WAC 458-07-030(1).

-8-

No. 83065-1-I/9

While intangible personal property is exempt from ad valorem taxation, RCW 84.36.070 distinguishes between intangible personal property and the characteristics or attributes of property.  Specifically, "intangible personal property does not include zoning, location, view, geographic features, easements, covenants, proximity to raw materials, condition of surrounding property, proximity to markets, the availability of a skilled workforce, and other <u>characteristics or attributes of property</u>."  RCW 84.36.070(3) (emphasis added).

RCW 84.36.070 provides in full:

> (1) Intangible personal property is exempt from ad valorem taxation.
> (2) "Intangible personal property" means:
> (a) All moneys and credits including mortgages, notes, accounts, certificates of deposit, tax certificates, judgments, state, county and municipal bonds and warrants and bonds and warrants of other taxing districts, bonds of the United States and of foreign countries or political subdivisions thereof and the bonds, stocks, or shares of private corporations;
> (b) Private nongovernmental personal service contracts, private nongovernmental athletic or sports franchises, or private nongovernmental athletic or sports agreements provided that the contracts, franchises, or agreements do not pertain to the use or possession of tangible personal or real property or to any interest in tangible personal or real property; and
> (c) Other intangible personal property such as trademarks, trade names, brand names, patents, copyrights, trade secrets, franchise agreements, licenses, permits, core deposits of financial institutions, noncompete agreements, customer lists, patient lists, favorable contracts, favorable financing agreements, reputation, exceptional management, prestige, good name, or integrity of a business.
> (3) "Intangible personal property" does not include zoning, location, view, geographic features, easements, covenants, proximity to raw materials, condition of surrounding property, proximity to markets, the availability of a skilled workforce, and other characteristics or attributes of property.
> (4) This section does not preclude the use of, or permit a departure from, generally accepted appraisal practices and the appropriate application thereof in the valuation of real and tangible personal property, including the appropriate consideration of licenses, permits, and

No. 83065-1-I/10

franchises granted by a government agency that affect the use of the property.

DOR's regulations also explain the difference between exempt intangible property and other intangibles. WAC 458-50-160(4) explains:

Nonproperty intangible characteristics or attributes are elements or components of value associated with a real or tangible asset. These characteristics or attributes are "intangible" but they are not "property" and therefore are not tax exempt intangible personal property. They are contingent and dependent upon other property and cannot be owned, used, transferred, or held separately from other property. To the extent that these characteristics, attributes, or other factors contribute to, or affect the value of property, they must be appropriately considered when determining taxable value. They include the following types:
(a) Zoning, location, view, geographic features, easements, covenants, proximity to raw materials, condition of surrounding property, proximity to markets, or the availability of a skilled work force;
(b) Grants of licenses, permits, and franchises by a government agency that affect the use of the property being valued; and
(c) Other characteristics of property, such as scarcity, uniqueness, adaptability, or utility as an integrated unit.

The Board's findings and conclusions fall within the plain meaning of RCW 84.36.070(3) and WAC 458-50-160(4). First, the Board heard testimony of the increasing demand for LPG in Asian markets and the properties' proximity to these markets. Second, witnesses for both parties recognized the uniqueness and scarcity of Petrogas's properties, being the only LPG export facility on the West Coast. Finally, the Assessor provided testimony that the terminal and wharf benefit from their utility as an integrated unit. While Petrogas's appraiser denied that the properties benefit from operation as an integrated unit, Reilly conceded that without the terminal the wharf would have no ability to ship LPG via ocean-going vessels.

-10-

No. 83065-1-I/11

Because the plain language of RCW 84.36.070(3) permits consideration of characteristics or attributes of property such as scarcity, uniqueness, and value as an integrated unit, the Board did not err.

B. Aquatic Lands Lease

Petrogas argues that as a leasehold interest in public land, the aquatic lands lease is exempt from taxation. Under RCW 84.36.451(1)(a) and (c), any leasehold interest to occupy or use property owned by the State of Washington is exempt from taxation. The Assessor concedes that by statute, leasehold interests in government-owned property are exempt from ad valorem property taxation. But the Board did not include the leasehold interest as taxable value. Instead, the Board concluded that it was error for Petrogas's appraisal to not include the aquatic lands lease as a characteristic or attribute of intangible property in its valuation. RCW 84.36.070(1).

Under RCW 84.36.070(4), the exemption of intangible personal property does not preclude the use of "generally accepted appraisal practices and the appropriate application thereof in the valuation of real and tangible personal property, including the appropriate consideration of licenses, permits, and franchises granted by a government agency that affect the use of the property." In addition, under WAC 458-50-160(4), when determining taxable value, characteristics, attributes, or other factors that contribute to, or affect the value of property must be appropriately considered. These factors include "[g]rants of licenses, permits, and franchises by a government agency that affect the use of the property being valued." WAC 458-50-160(4)(b).

The Assessor testified before the Board that he did not attribute any value directly to the aquatic lease in his assessment. Instead, he considered "the contributory

-11-

value associated with the highest and best use of the property that is valuing the property in recognition of the presence of that lease." Petrogas's appraisal considered the aquatic lands lease to be an intangible asset and assigned no taxable value. Reilly explained, "in arriving at my value conclusion under the cost approach, we did not appraise intangible values or value in my overall conclusions."

The plain language of RCW 84.36.070(4) and WAC 458-50-160(4) support consideration of the aquatic lands lease because it affects the highest and best use of the properties. In this case, the aquatic lands lease is intertwined with a real asset because it pertains directly to the use of the wharf. In addition, use of the wharf contributes directly to the business of the terminal. The terminal uses the wharf to ship LPG across the Pacific Ocean. The lease allows Petrogas to dock 48 ships at the pier per year. The value of the wharf would be diminished without this permitted use.

Because the aquatic lands lease could be considered in determining the highest and best use of the property, the Board did not err.

C. Market Value Approach

Petrogas argues that the Board erred by rejecting its appraisal and concluding that the cost approach to valuation should not be a dominant factor. The Assessor argues that Petrogas's appraisal was rejected by the Board because it ignored the sales of the subject properties and excluded intangible attributes that should be considered in valuation. We agree with the Assessor.

In determining market value, there are three general approaches. Washington Beef, Inc. v. County of Yakima, 143 Wn. App. 165, 165, 177 P.3d 162 (2008). In general, appraisers use one or a combination of the approaches to arrive at fair market

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 83065-1-I/13

value.  Washington Beef, 143 Wn. App. at 165-66; WAC 458-070-030(2).  First, under the income approach, value is approximately equal to the present value of the future benefits of property ownership.  Sahalee Country Club, Inc. v. Bd. of Tax Appeals, 108 Wn.2d 26, 33, 735 P.2d 1320 (1987).  Second, the cost approach estimates what it would cost a typically informed purchaser to produce a replica of the property in its present condition.  Sahalee, 108 Wn.2d at 33.  Third, under the sales approach, an appraiser compares the sale prices of similar properties.  Sahalee, 108 Wn.2d at 33.  When the supporting data is adequate, the sales approach is the most reliable method of valuation.  Sahalee, 108 Wn.2d at 33.

Because the sales approach is the most reliable method, RCW 84.40.030(3)(a) requires an assessor to base valuation on any sales of the property being appraised or similar property sold within the past five years.  (Emphasis added).  Similarly, WAC 458-07-030(2)(a) provides that sales of the property being appraised that occurred within five years of the assessment are valid indicators of true and fair value.  The assessor should be afforded considerable discretion in determining property value for tax purposes.  Folsom v. Spokane County, 106 Wn.2d 760, 769, 725 P.2d 987 (1986).

Petrogas relies on RCW 84.40.030(3)(b) for the proposition that in assessing property of a complex nature, the dominant factors in valuation should be "cost, cost less depreciation, reconstruction cost less depreciation, or capitalization of income that would be derived from prudent use of the property."  Petrogas also cites several cases that recognize the validity of the cost approach.  Both parties agree that the property is of a complex nature.  But they disagree that the cost approach was the only appropriate

-13-

method of valuation. Thus, the issue is whether the Board's decision to reject Petrogas's appraisal was supported by substantial evidence. RCW 34.05.570(3)(e).

Petrogas's appraisal by Reilly only used the cost approach. Reilly concluded that the income approach was not a meaningful indicator of value because there were limited historical financials, a limited number of comparable terminals to establish a regional market, related parties leading to unrecognized revenues and operating expenses, limited information to develop market-based throughput rates for the West Coast, and the overall highly proprietary nature of LPG terminal history. Reilly did not use the sales comparison approach because he only found two comparable sales that failed to disclose the purchase consideration. While Reilly did not consider the sales of the terminal and wharf to Petrogas in his valuation because he did not believe the sales represented market value, per RCW 84.40.030(a), because the sales were within five years, they should have been considered.

In contrast, the Assessor, and DOR, used all three valuation methods to determine the market value of the terminal and wharf. The Assessor also relied on the sales of the terminal and wharf in his valuations.

The Board also heard testimony from Eyre and reviewed his report. Eyre criticized the Reilly appraisal for failing to appraise the properties as a going concern using the unit valuation concept, ignoring the sales of the subject properties, and failing to include all taxable property.

Contrary to Petrogas's argument, the Board did not require all three approaches to valuation in this case. Instead, the Board considered relevant facts and expert opinions on true market value. It made factual determinations with the proper standards

-14-

No. 83065-1-I/15

in mind, specifically finding that Reilly's appraisal failed to "consider intangible characteristics including proximity to Asian markets, scarcity of LPG facilities on the West Coast, the aquatic lands lease, and the number of ships that can land at the wharf annually." As a result, the Board concluded that Reilly's appraisal erred because it did not appropriately consider the subject sales.

Because the Board "showed a good understanding of the accounting and economic principles in play here," we find that the findings of fact are supported by evidence and support the conclusions of law. Washington Beef, 143 Wn. App. at 170.

Affirmed.

_____
Mann, J.

WE CONCUR:

_____        _____
Birk, J.                                  Dwyer, J.