# Lake Monticello Owners' Association

## v.

# Walter T. Ritter, Commissioner of Revenue of Fluvanna County, et al.

Record No. 820157

Decided March 8, 1985, at Richmond

Present: All the Justices

*Francis L. Buck (Bailes, Buck, Hogshire & Gouldman, Ltd.*, on briefs), for appellant.

*Frederick W. Payne (James M. Bowling, IV; Leonard F. Jones, Commonwealth's Attorney; St. John, Bowling, Payne & Lawrence*, on brief), for appellees.

*Amicus Curiae: Aquia Harbour Property Owners Association, Inc. (George E. Marzloff*, on brief), for appellant.

THOMAS, J., delivered the opinion of the Court.

In this appeal, Lake Monticello Owners' Association (the Association) contends that certain property owned by it in the Lake Monticello residential subdivision of Fluvanna County was erroneously assessed by the County in the years 1977, 1978, 1979, and 1980.[1] The property in question consists of a golf course and clubhouse (sometimes hereinafter collectively referred to as the "common area").

According to the Association, the lot owners in the subdivision have easement rights over and to the common area such that the lots are dominant estates as to the common area. The Association contends further that because of the easements, any value contained in the common area has been transferred to the dominant estates and that, as a result, the common area has only nominal value for tax purposes. The County argues that despite the easements the common area has substantial value for tax purposes. The trial court agreed with the County and upheld the challenged assessments. We conclude the trial court erred.

---

[1] The taxes for the years 1977 through 1979 were paid prior to suit; the Association seeks a refund as to those amounts. The taxes for 1980 were not paid; the Association seeks a declaration that those taxes are not owing.

The development at Lake Monticello began in 1969. Lake Monticello is a residential subdivision, containing approximately 4,600 lots. The development contains a 490-acre lake, a 220-acre golf course, a 7.75-acre clubhouse area, and other recreational facilities. The lots are laid out around and near the lake and golf facilities. Lake Monticello was planned as a recreational community.

At the start of the development, the developer owned and intended to retain ownership of the recreational facilities. However, in 1970, the developer determined that this would not be economically feasible. In 1971, the developer created the Association as a tax-exempt, non-profit corporation to promote "the common good and general welfare of the people of the Lake Monticello community." Lot owners automatically became members of the Association.

On October 26, 1974, the developer contracted with the Association to transfer to the Association title to the common area and recreational amenities. The transfer was made by deed dated December 20, 1976, and recorded on June 15, 1977.

The transfer consisted of the lake, the golf course, the clubhouse, and other parcels. The deed recited a nominal consideration of ten dollars. However, the deed contained an easement for the benefit of the lot owners in the following language:

> an easement and right of way over, and the right of access to the improvements located on, the land and roads conveyed hereby for the benefit of current and future owners of property, now or heretofore owned by the Grantor and being developed as part of the Lake Monticello Subdivision, subject to the right of the Board of Directors of the Lake Monticello Owners' Association to make reasonable regulations for the use of the lake, golf course, roads, improvements and other property herein conveyed.

The Association operates on a budget of $700,000 to $800,000 per year. The money is spent to provide security, maintain the streets, subsidize the volunteer fire department and rescue squad, and operate and maintain the recreational facilities. The golf course has never operated at a profit. Its deficit and other deficits in operating the Association are made up by the fees collected from the lot owners. These fees total approximately $525,000 per year based on a charge of $120 per lot.

In order to help make the golf course either self-sufficient or profitable, the Association attempted to sell golf memberships at $350 per year. These special memberships permitted non-residents to use the golf course and certain other facilities. Between 80 and 100 such memberships were sold generating approximately $30,000. However, the quota for this type membership was never reached nor did the golf course become self-sufficient.[2]

The reassessment of property which went into effect on January 1, 1977, was based on appraisals performed in 1972. At that time, the developer still owned the common area; no easements burdened the common area for the benefit of the lot owners; the golf course was not complete and had not, therefore, gone into full operation; and the clubhouse had not been built. The common area was reassessed in late 1977 for purposes of 1978 taxes. However, at that time, the assessor was unaware that the property had been transferred for nothing more than nominal monetary consideration. The 1977 assessment served as the basis for the 1979 and 1980 taxes.

The common area was assessed at approximately one million dollars. At trial, the assessors contended that even with knowledge that the common area was subject to the easement rights of 4,600 lot owners, they would not change their assessment.

The assessors admitted on several occasions in their testimony that the existence of the common area enhanced the value of the individual lots. The assessors said that to avoid double taxation, they reduced the value of the several lots by $500 each, and that when the $500 is multiplied by 4,600 the result, approximately two million dollars, is the value of the common area. One assessor said that since the common area has a value of more than two million dollars, the assessment of approximately one million dollars is conservative.

The resolution of this appeal turns on the legal question of the proper application of *Bank* v. *Amherst County*, 204 Va. 584, 132 S.E.2d 721 (1963).[3] The Association argues that where a ser-

---

[2] The Association also attempted to sell another type membership called "associate membership" which would have allowed use of certain facilities not including the golf course. The associate memberships, sold at $115, generated less than $10,000.

[3] In its brief and in oral argument, the County expressly reserved an assignment of cross-error concerning the introduction into evidence of a certain document which the County contended was inadmissible. However, this issue was neither briefed nor argued. Therefore, we will not adjudicate it.

vient estate is burdened by an easement for the benefit of dominant estates then, for tax purposes, the value of the servient estate is to be reduced and that of the dominant estate increased in accord with the corresponding burden and benefit. The Association submits that this Court adopted the foregoing rule in *Amherst County*. The Association is correct.

*Amherst County* concerned the assessment of property on which was located two dams. One dam and its related property was subject to an easement for the benefit of another piece of property owned by a stranger. The burden of the easement was such as to limit the uses to which the dam could be put. Efforts to sell the dam had been unavailing. We said that the taxpayer's interest in the dam consisted of only that which was left after "taking therefrom the easement retained therein by the grantor." *Id.* at 589, 132 S.E.2d at 725. We then quoted with approval the following language from *Tax Lien Co.* v. *Schultze*, 213 N.Y. 9, 11, 106 N.E. 751, 752 (1914):

> "When an easement is carved out of one property for the benefit of another, the market value of the servient estate is thereby lessened, and that of the dominant increased practically by just the value of the easement; the respective tenements should therefore be assessed accordingly."

204 Va. at 589, 132 S.E.2d at 725. We first announced this principle more than twenty years ago, but until this appeal, we have not been called upon to apply it.

The purpose of the rule has not changed or diminished over time. *See* 2 *American Law of Property* § 8.104 (A. Casner ed. 1952); Bonbright, *The Valuation of Real Estate for Tax Purposes*, 34 Colum. L. Rev. 1397, 1435-36 (1934). The rationale behind the rule was explained in 6 P. Rohan, *Home Owner Associations and Planned Unit Developments Law and Practice* § 14.02 (1980), which states that where an owners' association holds title to common property,

> an assessor could not fully tax the homes (based on their current fair market value), while fully taxing the common areas, title to which is held by the association. In such a case, the assessor would have to adopt one of two solutions to the double taxation problem. The assessments (and concomitant real estate tax) of the constituent home owners could be re-

duced to reflect the fact that the recreational or other common facilities were being separately taxed. *This solution, while sound in theory, works a hardship on the participating home owners (who would be ultimately paying the association's real estate taxes), in that they would not be entitled to an income tax deduction for the real estate taxes paid by the association.* Since the latter is the record owner of the real estate and the party paying the real estate levy, the constituent owners cannot deduct their pro rata share of the association's real estate tax.

(Footnote omitted) (emphasis added). The rule we announced in *Amherst County* insures that the taxpayer pays taxes in accord with the benefit derived from the property in question. It eliminates the risk that a taxpayer will be required to pay taxes without receiving any benefit from the taxed property.

■ In this case, all the witnesses agreed that the easements on the common area benefitted—that is, added value to—the individual lots. In addition, the County's assessors admitted that instead of apportioning the value of the common area to the several lots, they did just the opposite. They subtracted value from the several lots, placed the value on the common area, and taxed the common area. During oral argument, the County's attorney, in response to a question from the Court, stated as follows:

I think everyone agreed that the existence of the . . . easement, the so-called common area, the proximity of the recreational facilities did increase the value of the lots. Mr. Morelli [the County's assessor] testified, without contradiction, that in fact he did *reduce the value of the lots by exactly what he found to be the value of the . . . so-called common areas apportioned numerically and proportionately to each of the lots.* In other words, what he said he did was if he found a lot to have a $8500 value he reduced it to $8000 because 1/4600th interest of the total value of the so-called common areas would have been $500.

In our view, this is essentially an admission that *Amherst County* was not followed. In his testimony at trial, the assessor made clear that had he been aware of the easements on the common area, he would have apportioned the value of the common area to the individual lots. In Morelli's own words:

I would appraise it [the common area] and apportion it to all of the—the lots in the—in the subdivision.

What Morelli said he would have done had he known of the easement is exactly what *Amherst County* mandates and what the Association seeks in this appeal. Significantly, there is no conflict among the experts on the question whether the common area has value. They all agree that it does. The difference is that the taxpayer's experts submit that because of the easement for the benefit of the lot owners, the value ought to be placed upon the lots. At the time the assessments were made, the County's assessors were of the view that the opposite approach should be followed. However, the testimony at trial makes clear that the County's assessors did not have complete information. Morelli's testimony establishes that with full information, he would have done just what the taxpayer suggests.

Both parties have cited cases from foreign jurisdictions which take opposing views on similar issues. However, *Amherst County* is controlling; therefore, we need not discuss the foreign cases. Moreover, our disposition of this appeal makes it unnecessary for us to discuss the remaining assignment of error.

In light of the foregoing, we hold that it was error for the trial court to uphold the 1977, 1978, 1979, and 1980 assessments of the common area for more than nominal amounts. Therefore, the judgment of the trial court will be reversed and the case remanded for the assessment of the common area at a nominal amount.

*Reversed and remanded.*