BREEZY KNOLL ASSOCIATION, INC. *v.*
TOWN OF MORRIS
(SC 17815)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Schaller, Js.

Argued November 28, 2007—officially released May 13, 2008

*James Stedronsky*, for the appellant (plaintiff).

*J. Michael Sconyers*, with whom was *Ruth C. Nadeau*, for the appellee (defendant).

*Opinion*

ROGERS, C. J. This case concerns the valuation, for property tax purposes, of common areas owned by a neighborhood homeowners' association when those common areas are subject to extensive encumbrances that solely benefit the association's neighborhood resident members. The plaintiff, Breezy Knoll Association, Inc. (association), appeals from the judgment of the trial court dismissing its municipal tax appeal, brought pursuant to General Statutes § 12-117a, for lack of aggrievement.[1] The association claims that the court

---

[1] General Statutes § 12-117a provides in relevant part that "[a]ny person . . . claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom . . . to the superior court for the judicial district in which such town or city is situated . . . ."

improperly concluded that it failed to prove that the defendant, the town of Morris (town), had overvalued its properties for tax purposes because various easements and restrictions burdening those properties rendered them unsaleable and reduced their fair market value to a nominal amount. According to the association, pursuant to this court's decision in *Einbinder* v. *Board of Tax Review*, 217 Conn. 240, 584 A.2d 1188 (1991),[2] when taxable real property is so heavily burdened by easements and restrictions that there is no reasonable likelihood that it could be sold on the market, its value inures chiefly to the dominant estate owners who benefit from the easements and restrictions and should be reflected in the assessments of those owners' properties, rather than in the assessment of the encumbered, servient property. We agree and, accordingly, reverse the judgment of the trial court.

The following facts, either found by the court or not disputed, and procedural history are relevant to the appeal. The association is a Connecticut membership corporation formed in 1960 for the purpose of maintaining, preserving and protecting commonly used property within Breezy Knoll, a private lakefront community in the town of Morris. Membership in the association is limited to the owners of the nineteen individual residential properties comprising Breezy Knoll.

The association holds title to three commonly used properties within Breezy Knoll that are the subject of this appeal. Those properties are a 0.84 acre parcel that is used as a parking lot, a 0.56 acre parcel on which

---

[2] This court did not produce a substantive opinion in *Einbinder*, but rather, "adopt[ed] the trial court's well reasoned decision as a statement of the facts and the applicable law on [the] issues" raised in that case. *Einbinder* v. *Board of Tax Review*, supra, 217 Conn. 242, adopting *Pepe* v. *Board of Tax Review*, 41 Conn. Sup. 457, 585 A.2d 712 (1990). Accordingly, when discussing the holding in *Einbinder*, we cite to the trial court's decision in *Pepe*.

there is a tennis court, and a strip, 10 feet in width and 504 feet in length, located along the shoreline of Bantam Lake and adjacent to four of the residential lots within Breezy Knoll. The deeds transferring ownership of the three properties to the association subject those properties to a number of easements and restrictions.[3] The deeded easements and restrictions also have been incorporated into the association's bylaws.

The applicable provisions ensure that the residents of Breezy Knoll, as members of the association, will have continuous access to the common areas, and require the association to own and maintain them for the members' use and enjoyment.[4] The costs of operation and maintenance are chargeable to association members by way of an annual fee. Pursuant to the deeds, the easements and restrictions "shall be operative and binding on all future owners of any interest in . . . Breezy Knoll . . . for a period not exceeding twenty one years after the death of the survivor of all

---

[3] The easements and restrictions were recited primarily in the deed transferring ownership of the tennis court property to the association. In that deed, however, the grantors explicitly "covenant[ed] and agree[d] with [the association] . . . that all sales or other disposition of their property within Breezy Knoll . . . shall be subject to the following [easements and restrictions] which shall be recited in all deeds thereto specifically or by reference to this instrument, and which [easements and restrictions] shall all be covenants running with the land . . . ." The grantors originally owned all of the property comprising Breezy Knoll, including the parking lot and lakefront strip. Consequently, those properties also are subject to the easements and restrictions recited in the tennis court deed.

[4] Specifically, "[m]embers of the [a]ssociation shall at all times have the right and privilege to cross and recross and pass and repass over all lands of Breezy Knoll . . . and their general use of the lands shall in no way be restricted or encumbered . . . ." Additionally, the association "agrees and covenants . . . to own, operate and maintain the . . . lake front property [and associated equipment], [the] tennis court . . . and other [community properties] . . . for the common use and benefit of all owners of land within Breezy Knoll . . . so long as such owners are and continue to be members of the [a]ssociation; [and] that such community property shall remain open and in suitable condition for the convenient use and enjoyment of its members, as appurtenant to the lands owned by its members . . . ."

the now living persons who shall together constitute the original members of the [association]."[5] The association's bylaws, however, contain no such time limitation. The easements and restrictions may not be altered, amended, revoked or terminated, nor may the lands affected be released from them, unless two-thirds of the owners of Breezy Knoll properties provide written consent. Similarly, the association's bylaws may not be amended without the approval of 80 percent of its members.

Following a comprehensive townwide revaluation conducted in 2004; see General Statutes (Rev. to 2003) § 12-62, as amended by Public Acts 2004, No. 04-2, § 33; the town's assessor, Barbara Bigos, assigned new values to the association's properties for the October 1, 2004 grand list. Bigos first determined that the highest and best uses of the parking lot and tennis court properties were as lots for single-family dwellings. She then assigned those properties values of $107,957.14 and $105,328.57, respectively, on the basis of comparable sales. As to the lakefront strip, Bigos valued it at $378,000 by multiplying its total length by a per foot figure that she had derived from sales of other properties around the lake.[6]

Pursuant to General Statutes § 12-111 (a),[7] the association contested Bigos' valuations by appealing to the town's board of assessment appeals (board). It argued that, given the easements and restrictions encumbering

---

[5] At the time of trial, there were members of the original association still living.

[6] The cited figures represent Bigos' determination of the properties' true and actual values. The properties were assessed for tax purposes at 70 percent of those values. See General Statutes § 12-62a (b).

[7] General Statutes § 12-111 (a) provides in relevant part that "[a]ny person . . . claiming to be aggrieved by the doings of the assessors of [a] town may appeal therefrom to the board of assessment appeals. . . . Such board may equalize and adjust the grand list of such town and may increase or decrease the assessment of any taxable property or interest therein . . . ."

the commonly used properties, they were unmarketable and, therefore, their value had been diminished greatly to a nominal amount. Following the board's denial of its appeals, the association appealed to the Superior Court pursuant to § 12-117a. See footnote 1 of this opinion. It subsequently amended its complaint to challenge the valuations in the October 1, 2005 grand list, in addition to the valuations in the 2004 grand list.[8] As to both years, the association alleged that Bigos' valuations did not represent the true and actual values of its properties, but rather, were grossly excessive, disproportionate and illegal.

At trial, Bigos, as well as three other appraisers, testified in regard to the valuation of the association's properties. As to each property, Bigos testified that she had not attributed any of its value to the association members in connection with the assessment of the members' properties. Rather, she assessed them as separate, independent units, and attributed their value to the association only as the owner of the fee. In Bigos' view, she had the alternative of doing it either way.[9] When ques-

---

[8] "If, during the pendency of [a municipal tax] appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the . . . board of assessment appeals . . . to make such amendment effective. . . ." General Statutes § 12-117a. The valuations used by the town on its October 1, 2005 grand list were the same as those used in the October 1, 2004 grand list.

[9] R. Bruce Hunter, another appraiser who had been hired by the town to provide an opinion as to the values of the properties, testified similarly that there were two ways to approach valuation. According to Hunter, one method was to "look at [this] as an individual valuation, which is what it is that the assessor has done, which is to value . . . each one of these parcels . . . and then . . . have that owned by and assessed to the association, and the other way that you could value this is . . . [to] take the common elements and have them reflected in the unit value.

"But in this case it's half a dozen [of] one, six of the other. It's—somewhere this value needs to be attributed to the people who have benefit of it. They all have [the] benefit of and own the parking lot. They all have [the] benefit [of] and own the tennis court and they all have [the] benefit [of] and own the most valuable part of it which is the water frontage . . . ."

tioned by the association's counsel, Bigos stated that, because she believed it was inapplicable, she did not consider the rule articulated in *Pepe* v. *Board of Tax Review*, 41 Conn. Sup. 457, 464–69, 585 A.2d 712 (1990), which provides that when property is so heavily burdened by easements that it becomes unmarketable, its value should be assessed in conjunction with the properties benefiting from those easements.

Bigos testified that she "wrestled" with what consideration she should give the deeded easements and restrictions when valuing the properties, because she considered them to be a "positive benefit," not a "negative factor," and she thought that they actually "enhanced the properties . . . ." Because she was valuing the properties separately, however, and not attributing their value to the individual members' properties, she chose to account for the easements and restrictions by assigning the tennis court and parking lot lower building site ratings than she otherwise would have.[10] In regard to the lakefront strip, Bigos explained that she valued it at $750 per linear foot, the same as she had valued every waterfront property around the entire lake. Because the strip's physical characteristics pre-

---

[10] Bigos explained: "When you price a building lot . . . you start out with how many acres somebody has, the acreage. And you can add on to that other factors that will affect the value.

"I add as many values as I possibly can to come to good values. I have neighborhood codes so that everybody in that neighborhood was neighborhood seven. There were many different neighborhoods in the town based upon what the sales told me. Then I gave a site [rating]. . . . I actually rated every single site for its quality . . . [by considering] if it was near the road or it had restrictions or it had a view or stone walls or a pond. So we actually did each individual property with a site [rating]. And the [site ratings] ranged from one to six, one being the lowest. And we did put a one on [the tennis court property] because of the restrictions." Bigos went on to explain that different site ratings would result in different multipliers, which then were applied to the base value of a property's acreage, potentially increasing its value. A site rating of one resulted in a multiplier of one, thus resulting in no additional value.

cluded any construction, she disregarded its ten foot width and, therefore, did not assign it additional value for its acreage.[11] To account for the easements and restrictions, Bigos did not adjust the value of the strip itself, but assigned a lower neighborhood rating to the residential lots adjacent to it.[12]

The association presented the testimony of appraiser Barry Cunningham in support of its position that, given the easements and restrictions, the properties had only nominal value. Cunningham described the first step in the appraisal process as determining the properties' highest and best use, given what is physically possible, legally permissible, financially feasible and maximally productive. The second step is determining whether, in light of that use, a market existed for the properties and, if so, examining comparable sales within that market to estimate value. In Cunningham's opinion, the highest and best use for all of the association's properties was the current use as community amenities because the deeded easements and restrictions precluded selling the properties and it was "highly improbable" that those restrictions would be lifted so as to make development

[11] Bigos explained: "You can't build on it. I didn't necessarily think that anybody was going to use it for anything. . . . It was nominal and I didn't even bother to value it. I probably should have, because everybody pays for their acreage. And I didn't even charge them for that acreage."

[12] Bigos explained that every lakefront property owner, regardless of the type of property, paid $750 per linear foot of lake frontage, and that "the difference in the [quality of the waterfront] goes into the neighborhood or the site factor, but front foot is front foot." According to Bigos, "[i]f the [adjacent lot owners who previously] owned [the strip] hadn't given it to [the association], those [lot owners] would be charged for that linear foot." Bigos explained further that most desirable waterfront sites such as Breezy Knoll's had a high neighborhood rating of D, which resulted in a multiplier of 5.65. Bigos stated: "Breezy Knoll, all those waterfront ones . . . do not have a D. They only have an A. And, again, these are self-imposed and I had wrestled with it, but I gave them the benefit of the doubt and I used [a neighborhood rating of] A, which [results in a multiplier of] 5."

possible.[13] Cunningham agreed that the easements and restrictions operated to benefit the lot owners within Breezy Knoll, and he opined that the value of community property typically was reflected in increased values of the individual properties that benefited from it. On the basis of his determination that the highest and best use of the association's properties was as community property, Cunningham concluded that the properties were not marketable and, therefore, should be assigned either no value, or only a nominal value,[14] for tax purposes.[15]

The trial court concluded that the association had not shown that its property had been overvalued. The court found Cunningham's testimony to be "credible and interesting" and "value[d]," but nevertheless, found that of Bigos to be "far more comprehensive, reliable and persuasive."[16] In regard to the tennis court and parking lot, the court noted that Bigos had assigned those parcels a lower site rating in light of the easements and restrictions, notwithstanding the fact that the lot owners, as members of the association, could vote to remove the easements and restrictions and sell the properties unencumbered. As to the lakefront strip, the

---

[13] R. Bruce Hunter also testified that it would be "highly unlikely" that the association members would agree to sell the properties because they constituted significant amenities. According to Hunter, "[i]t would be highly unlikely because it's in their best interest not to do that because they get such a great value from that, from the various parcels."

[14] Cunningham offered a range of $15,000 to $23,000 as the nominal value of all three properties, collectively.

[15] Another appraiser with whom the town had consulted in 2005, Arthur Oles, also testified for the association. Oles agreed with Cunningham's opinion that the association's properties had only nominal value because the restrictions, which the association members were highly unlikely to remove, rendered the properties unmarketable. According to Oles, the value of the association's properties should be incorporated into the assessments of the individual lot owners' properties.

[16] The court did not discuss explicitly the testimony of R. Bruce Hunter or Arthur Oles.

court noted that Bigos had assessed the property at the same rate as all other lakefront property and had not increased the assessment to account for its acreage. After citing Bigos' testimony as to the general trend of greatly increasing property values in northwest Connecticut, in particular for lakefront property, the court concluded that the association had not met its burden of proving an overassessment and, accordingly, dismissed the appeal for lack of aggrievement.[17] This appeal followed.

We begin with the principles governing municipal tax appeals. "Section 12-117a, which allows taxpayers to appeal the decisions of municipal boards of [assessment appeals] to the Superior Court, provide[s] a method by which an owner of property may directly call in question the valuation placed by assessors upon his property . . . . In a § 12-117a appeal, the trial court performs a *two step function.* The burden, in the first instance, is upon the plaintiff to show that he has, in fact, been aggrieved by the action of the board in that his property has been overassessed. . . . In this regard, [m]ere overvaluation is sufficient to justify redress under [§ 12-117a], and the court is not limited to a review of whether an assessment has been unreasonable or discriminatory or has resulted in substantial overvaluation. . . . Whether a property has been overvalued for tax assessment purposes is a question of fact for the trier. . . . The trier arrives at his own conclusions as to the value of land by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances

---

[17] The court's memorandum of decision does not address the applicability of the holding of *Pepe* v. *Board of Tax Review,* supra, 41 Conn. Sup. 457. By relying on the testimony of Bigos to conclude that the association had not been overassessed, however, the court implicitly found that Bigos' underlying methodology was sound, including her threshold determinations that the tennis court and parking lot properties could be used as building lots and that the holding of *Pepe* was not applicable to the valuation of any of the association's properties.

in evidence bearing on value, and his own general knowledge of the elements going to establish value including his own view of the property. . . .

"Only after the court determines that the taxpayer has met his burden of proving that the assessor's valuation was excessive and that the refusal of the board of [assessment appeals] to alter the assessment was improper, however, may the court then proceed to the second step in a § 12-117a appeal and exercise its equitable power to grant such relief as to justice and equity appertains . . . . If a taxpayer is found to be aggrieved by the decision of the board of [assessment appeals], the court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the applicant's property."[18] (Citations omitted; internal quotation marks omitted.) *Konover* v. *West Hartford*, 242 Conn. 727, 734–35, 699 A.2d 158 (1997).

Although the question of overvaluation usually is a factual one subject to the clearly erroneous standard of review; see *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 23, 807 A.2d 955 (2002); when a tax appeal, like the present one, raises a claim that challenges the propriety of a particular appraisal method in light of a generally applicable rule of law, our review of the trial court's determination whether to apply the rule is plenary. See *Sheridan* v. *Killingly*, 278 Conn. 252, 260, 897 A.2d 90 (2006) (applying plenary review to claim that trial court improperly rejected assessor's attribution of value of leasehold interest to lessor's property); see also *Torres* v. *Waterbury*, 249 Conn. 110, 118, 733 A.2d 817 (1999) (legal conclusions in municipal tax appeal

[18] In the present matter, the trial court did not reach the question of the true and actual value of the association's properties because it concluded that the association had not met its initial burden of showing aggrievement through overvaluation. Consequently, our review is limited to a determination of whether the court properly found that the association's properties had not been overvalued.

subject to plenary review). We now turn to the issue raised on appeal.

The association claims that the town's valuation, which the court found accurate on the basis of Bigos' testimony, runs counter to General Statutes § 12-63 (a),[19] which requires the assessment of property at its "fair market value." The association further claims that the town's valuation is contrary to a rule of valuation articulated in *Pepe* v. *Board of Tax Review*, supra, 41 Conn. Sup. 457, concerning the assessment of real property burdened by easements. According to the association, the easements and restrictions render the association's properties unmarketable, thus reducing their fair market values to nominal amounts. It argues, therefore, that the substantial assessments approved by the court necessarily represent overvaluations. The association claims further that, pursuant to *Pepe*, it is the owners of the residential properties within Breezy Knoll who enjoy and benefit from the easements and restrictions burdening the association's properties and, consequently, the value of the common areas properly should be reflected in the assessments of those properties and not in the assessment of the common areas themselves.

The town argues in response that the easements and restrictions placed on the association's properties are self-imposed and do not destroy the intrinsic value of that land, which consists of highly desirable parcels in an area of consistently increasing property values. It acknowledges that the easements and restrictions

---

[19] General Statutes § 12-63 (a) provides in relevant part that "[t]he present true and actual value of . . . property [other than farm land, forest land and open space] shall be deemed by all assessors and boards of assessment appeals to be the fair market value thereof and not its value at a forced or auction sale." Moreover, pursuant to General Statutes § 12-64 (a), real property shall be taxed "at a uniform percentage of its present true and actual valuation . . . ."

should factor into the valuation of the properties, but claims that Bigos' assessments properly took them into account. According to the town, the difference between attributing the value of the properties to either the association or to the residential lot owners "is merely semantics because the nineteen Breezy Knoll homeowners make up the . . . [a]ssociation . . . [and the] properties are owned, maintained and used by the . . . [a]ssociation and its members exclusively."[20] Finally, the town claims that *Pepe* is distinguishable from the present matter because the association here, unlike the plaintiff in *Pepe*, retains a benefit from its ownership of the properties in question, i.e., the recreational and parking facilities that it provides for its members, the individual property owners. We agree with the association.

In *Pepe* v. *Board of Tax Review*, supra, 41 Conn. Sup. 458, the plaintiff taxpayer was the developer of a 400 unit condominium complex.[21] The property subject to the tax appeal was a road that provided the only means

---

[20] The town claims further that the association's argument that Bigos improperly failed to attribute the value of the common areas to the residential properties is not a proper subject of a § 12-117a tax appeal, but instead should have been raised in an action pursuant to General Statutes § 12-119. We do not agree. "[Section] 12-119 requires an allegation that something more than mere valuation is at issue. It is this element that distinguishes § 12-119 from its more frequently evoked companion, [§ 12-117a]." *Second Stone Ridge Cooperative Corp.* v. *Bridgeport*, 220 Conn. 335, 340, 597 A.2d 326 (1991). Under § 12-119, there are two possible grounds for recovery: "the absolute nontaxability of the property in the municipality where situated, and a manifest and flagrant disregard of statutory provisions." (Internal quotation marks omitted.) Id. A claim that an assessor used an inappropriate method of appraisal, resulting in overvaluation, is not a claim of illegal or wrongful assessment and, therefore, is properly raised under § 12-117a. Id., 343; see, e.g., *Sheridan* v. *Killingly*, supra, 278 Conn. 254–55 (considering claim, raised in § 12-117a appeal, that trial court improperly rejected, as matter of law, assessor's methodology of considering value of leasehold interest when determining value of lessor's property).

[21] During the pendency of the appeal in *Pepe*, the plaintiff transferred his interest in the property at issue to third parties, who then were substituted as parties plaintiff. *Pepe* v. *Board of Tax Review*, supra, 41 Conn. Sup. 459.

of access to that complex. Upon completion of the complex, the plaintiff had granted an easement to the condominium's association, giving its members a right of ingress and egress over the road, and it became the association's responsibility to maintain and repair the road and the utilities running beneath it. Id. The plaintiff, however, retained ownership to the fee of the road, and the town of Woodbury sought to tax him on the basis of the road's full fair market value, which the town determined to be $889,242. Id., 458, 460. At trial, the plaintiff's expert testified that the road had nominal value at best because, given the easement in favor of the condominium association, there was no reasonable use for it but as a road. Id., 460.

The trial court, crediting the testimony of the plaintiff's expert, concluded that the plaintiff had been over-assessed. Id., 466. In so concluding, it cited the following principles of law: "When an easement is carved out of one property for the benefit of another the market value of the servient estate is thereby lessened, and that of the dominant [estate] increased practically by just the value of the easement; the respective tenements should therefor[e] be assessed accordingly." (Internal quotation marks omitted.) Id., 464. Moreover, when the nature of the easement is such that it "leaves the grantor with nothing more than the naked legal title to the land, the practical effect of the conveyance is to leave the grantor with nothing of value." Id., 465. In applying these principles, the court noted that the easement in question totally had eliminated any other use for the land beneath the road, and that the value of the condominium complex had been increased substantially by virtue of the easement. Id. Accordingly, "[t]he only conclusion that can be reached is that the land over which [the road] runs has a nominal value at best to the owners." Id., 465–66. The court did not conclude that the land had no value to anyone and thus could not be

taxed, but rather, that "its value inures to the adjacent property it serves." Id., 468.

The holding of *Pepe* is not anomalous, and the principles cited are not novel. There is ample authority for the general proposition that appurtenant easement rights enhance the value of, and should be assessed in conjunction with, the estate to which they are appurtenant, i.e., the dominant estate. *Norwalk* v. *New Canaan,* 85 Conn. 119, 127, 81 A. 1027 (1911), superseded by statute on other grounds as stated in *Hartford Electric Light Co.* v. *Wethersfield,* 165 Conn. 211, 215 n.4, 332 A.2d 83 (1973); 2 American Law of Property (Casner Ed. 1952) § 8.104, p. 310; 5 Restatement, Property, Servitudes § 509, comment (d), pp. 3101–3102 (1944); 1 J. Bonbright, Valuation of Property (1937) p. 496; 3 T. Cooley, Law of Taxation (4th Ed. 1924) § 1069, p. 2171; 3 T. Cooley, supra, § 1155, p. 2321; see also 6A P. Rohan, Real Estate Transactions: Home Owner Associations and Planned Unit Developments (2007) § 14.02 [1] [b], p. 14–5; see, e.g., *Supervisor of Assessments* v. *Bay Ridge Properties, Inc.,* 270 Md. 216, 222, 310 A.2d 773 (1973) (value of beach "became exclusively and permanently attached to the lots" whose owners were entitled to use it).

Furthermore, "a landowner whose property is subject to an easement [typically] is entitled to a reduced valuation," and when a "property is so encumbered with easements that no use can be made of it, the fee owner pays no tax. What is true of easements is true also of covenants binding the land."[22] 1 J. Bonbright, supra, p.

[22] "[T]here is no necessary equivalence between the damage a landowner suffers by being subjected to an easement [or restriction] and the benefit other land obtains from that easement [or restriction]." 1 J. Bonbright, supra, p. 497. In other words, it is possible for an easement or restriction to enhance greatly the value of the dominant estate without correspondingly depreciating the value of the servient estate. See id.; see also *Ex parte Lake Forest Property Owners Assn., Inc.,* 659 So. 2d 607, 609 (Ala. 1995); *Recreation Centers of Sun City, Inc.* v. *Maricopa,* 162 Ariz. 281, 287 n.7, 782 P.2d 1174 (1989).

496; see, e.g., *Cecarelli* v. *Board of Assessment Appeals*, 272 Conn. 485, 487–88, 863 A.2d 677 (2005) (upholding trial court's acceptance of assessment of property at nominal value, and rejecting town's assessment of property as "builder's lot," where owners had conveyed agricultural development rights to state and deed precluded use of property in ways inconsistent with use as agricultural land); *Konover* v. *West Hartford*, supra, 242 Conn. 733–34 (assessor, believing portion of property was subject to public roadway easement, assigned portion no value); *Supervisor of Assessments* v. *Bay Ridge Properties, Inc.*, supra, 270 Md. 222 ("[t]he combination of the grant of easements for the recreational use of the beach and the imposition of restrictions against disposition and improvements deprived the beach, as the servient estate, of whatever value it might otherwise have had"); *Four Hills Country Club* v. *Property Tax Protest Board*, 94 N.M. 709, 710, 616 P.2d 422 (1979) (agreeing that encumbrances can reduce property's

---

For example, when a homeowners' "association has retained the right to open the common elements [of its property] for public use, and, as a commercial enterprise, to charge the public for such use, a separate tax valuation of the common areas has been upheld." 6A P. Rohan, supra, § 14.02 [2], pp.14-10 through 14-11; see also *Grasser* v. *Graham*, 97 Misc. 2d 417, 419–20, 411 N.Y.S.2d 836 (1978) (listing factors to consider to determine whether servient estate owner has retained any beneficial interest). In the following cases, association property, although burdened by various easements or restrictions, was found to have retained significant value: *Beaver Lake Assn.* v. *Board of Equalization*, 210 Neb. 247, 253, 257, 313 N.W.2d 673 (1981) (association reserved use of lake, other facilities for corporate purposes without limitation); *Sun City Summerlin Community Assn.* v. *Dept. of Taxation*, 113 Nev. 835, 838, 842–43, 944 P.2d 234 (1997) (association supplemented income by allowing nonresident usage of golf course, which had potential for future profitability) (reh. denied January 23, 1998); *Tower West Apartment Assn., Inc.* v. *West New York*, 2 N.J. Tax 565, 570 (1981), aff'd, 5 N.J. Tax 478 (App. Div. 1982) (common parking garage had independent value when association retained right to lease spaces). In each of these cases, the homeowners' association, unlike the association in the present case, retained a benefit of something more than the ability to provide use of its properties only to its members, the owners of the dominant estates. Accordingly, we are not persuaded by the town's argument that *Pepe* is distinguishable from the present matter in this regard.

value to zero but finding that claim waived); *Twin Lakes Golf & Country Club* v. *King*, 87 Wash. 2d 1, 5, 548 P.2d 538 (1976) (recorded covenants, conditions and restrictions giving neighborhood lot owners rights to use neighborhood golf course and indicating that golf course property would remain open space rendered golf course without fair market value for tax purposes); see also *Tualatin Development Co.* v. *Dept. of Revenue*, 256 Or. 323, 332, 473 P.2d 660 (1970) (same).

Courts have adopted and applied the foregoing concepts in contexts identical to the present one, i.e., when the encumbered, servient property is a common area titled in a homeowners' association and the benefited, dominant properties are the residential properties owned by the individuals who are the association's members. See *Deerfield Village Community Assn.* v. *State Tax Commission*, 25 Mich. App. 138, 140, 181 N.W.2d 62 (1970); *Waterville Estates Assn.* v. *Campton*, 122 N.H. 506, 507, 446 A.2d 1167 (1982); *Grandview Heights Assn., Inc.* v. *Board of Assessors*, 176 Misc. 2d 901, 906, 674 N.Y.S.2d 571 (1998); *Beckett Ridge Assn.* v. *Board of Revision*, 1 Ohio St. 3d 40, 42–43, 437 N.E.2d 601 (1982); *Timber Trails Community Assn.* v. *Monroe*, 150 Pa. Commw. 29, 36, 614 A.2d 342 (1992); *Lake Monticello Owners' Assn.* v. *Ritter*, 229 Va. 205, 207, 327 S.E.2d 117 (1985); but see *Quivira Falls Community Assn.* v. *Johnson*, 230 Kan. 350, 634 P.2d 1115 (1981). With few exceptions,[23] the fact that the restrictions at issue are in some sense self-imposed, given the symbiotic relationship between an association and its mem-

---

[23] See *Recreation Centers of Sun City, Inc.* v. *Maricopa*, 162 Ariz. 281, 290, 782 P.2d 1174 (1989) (noting that "voluntarily imposed restriction [limiting use of property to operation of nonprofit community center and recreational facilities] . . . cannot be permitted to remove valuable property from the tax rolls"); *Grasser* v. *Graham*, 97 Misc. 2d 417, 420, 411 N.Y.S.2d 836 (1978) (observing that a servient estate has value when easement owners automatically are members of corporation owning property sought to be taxed).

bers, has not weighed in favor of a determination that the servient estate retained value.

Two cases are illustrative. *Lake Monticello Owners' Assn.* v. *Ritter,* supra, 229 Va. 207, was an appeal challenging the assessment of common areas, including a lake, golf course and clubhouse, located in a residential subdivision. The deed transferring the common areas to the plaintiff, a homeowners' association whose members were the individuals owning properties within the subdivision, included an easement over the common areas for the benefit of those lot owners. Id. The plaintiff contested the county assessors' valuation of the common areas at approximately one million dollars, arguing that because of the easements, the value of the common areas had been transferred to the dominant estates, leaving the common areas with only nominal value for tax purposes. Id., 206, 208. At trial, the assessors agreed that the common areas enhanced the values of the individual owners' properties, but explained that, in an effort to avoid double taxation, they had accounted for that circumstance by reducing each individual property's assessment by $500, then adding together all of those reductions to arrive at the value of the common areas, which then were assessed against the plaintiff. Id., 208.

The Virginia Supreme Court, relying on the same general rule cited in *Pepe,* agreed with the plaintiff that, "where a servient estate is burdened by an easement for the benefit of dominant estates then, for tax purposes, the value of the servient estate is to be reduced and that of the dominant estate increased in accord with the corresponding burden and benefit." Id., 208–209. The court concluded, therefore, that the assessors' methodology was contrary to law, and it reversed and remanded the case for an assessment of the common areas at a nominal amount. Id., 211.

Similarly, in *Waterville Estates Assn.* v. *Campton*, supra, 122 N.H. 507–508, the plaintiff, an association whose members were all of the homeowners within a condominium development, challenged the town's assessment of various recreational properties to which the association held title, arguing that the properties were so restricted by the homeowners' rights that they had no value for tax purposes. A recorded declaration stated that all of the homeowners would have a right, in the nature of an equitable servitude, to use the properties, and the homeowners' deeds provided similarly. Id., 508. The trial court agreed with the plaintiff, and ordered an abatement of the assessed value of $76,000 to a nominal value of only $100. Id. On appeal, the Supreme Court of New Hampshire affirmed the trial court's decision, rejecting the town's claim that, because a provision in the declaration allowing for removal of the restrictions upon a two-thirds vote of the plaintiff's membership rendered the restrictions transient and revocable at will, the restrictions did not destroy the value of the affected properties.[24] Id., 508–10. According to the court, the properties were "severely burdened" by the restrictions, given the high percentage of owners necessary to effect their release. Id., 509.

We conclude that a similar result is warranted here. Although the law generally affords wide discretion to assessors in choosing methodology and to trial courts in evaluating testimony, the latter, "in determining value . . . [are] under a legal compulsion to consider everything that might legitimately affect [it]." *Uniroyal, Inc.* v. *Board of Tax Review*, 174 Conn. 380, 390, 389 A.2d

---

[24] In *Waterville Estates Assn.* v. *Campton*, supra, 122 N.H. 508, the town claimed that the restrictions really were licenses, which generally do not diminish the value of real estate. See, e.g., *Lidell* v. *Mimosa Lakes Assn.*, 6 N.J. Tax 417, 428–29 (1984). We note that, in the present matter, the town has not argued that the easements and restrictions at issue actually are in the nature of licenses.

734 (1978). The principle articulated in *Pepe* and in the foregoing case law directly was applicable to the valuation of the association's properties and, because Bigos concededly disregarded it, the trial court improperly relied on her testimony to conclude that the association's properties had not been overvalued. Although Bigos purported to account for the effect of the easements and restrictions in an alternative manner, that alternative fell short of what was legally required.

Particularly, as to the waterfront strip, Bigos did not apply any downward adjustment to the value of that property to account for the fact that it was encumbered, but instead, chose to devalue the adjacent residential properties by applying a lower neighborhood rating to them.[25] Given that all of the testifying appraisers agreed that the easement rights over the strip *enhanced* the value of the residential properties, that approach lacked coherence. Furthermore, it left the strip itself at a valuation comparable to similar, but unencumbered, waterfront property around the lake.

As to the parking lot and tennis court, Bigos first assumed that their highest and best use[26] was as residen-

[25] As previously noted, the trial court considered Bigos' failure to attribute value to the acreage of the strip as an acceptable way of accounting for the easements and restrictions. Bigos' testimony establishes, however, that she did not consider the acreage because the physical characteristics of the strip precluded building on it, and not because of the easements and restrictions. See footnote 11 of this opinion.

[26] "A property's highest and best use is commonly accepted by real estate appraisers as the starting point for the analysis of its true and actual value." *United Technologies Corp.* v. *East Windsor*, supra, 262 Conn. 25. "A property's highest and best use is commonly defined as the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." (Internal quotation marks omitted.) Id. "The highest and best use conclusion necessarily affects the rest of the valuation process because, as the major factor in determining the scope of the market for the property, it dictates which methods of valuation are applicable." Id., 25–26. "[A]n extremely narrow highest and best use conclusion might result in a very small or even nonexistent market, thereby eliminating the availability of market sales analysis as a useful valuation tool." Id., 26 n.22.

tial building lots, and only thereafter did she attempt to account for the effect of the easements and restrictions by applying a lower building site rating. For a particular highest and best use determination to be viable, however, there must be "a reasonable probability that the subject property would be put to that use in the reasonably near future . . . ." (Internal quotation marks omitted.) *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 65, 931 A.2d 237 (2007). The various appraisers uniformly testified, however, that the Breezy Knoll residents were highly unlikely to agree to remove the easements and restrictions,[27] which would be necessary to render the properties marketable as residential building lots. In view of that evidence, it was improper for the court to rely on a valuation that assumed a buildable lot.[28]

In light of the pertinent law that Bigos did not consider applicable, the extensive easements and restrictions encumbering the association's properties, and the unanimous testimony of the appraisers that the association's members were not likely to consent to release those easements and restrictions—a necessary prerequisite to marketability—we conclude that Bigos necessarily overvalued the association's properties and that the court's finding to the contrary, which rested on Bigos' testimony, was improper. Because the easements and restrictions effectively precluded the properties from being sold, the properties should have been valued at a nominal amount only. Although we agree that the

[27] See footnotes 13 and 15 of this opinion. Bigos did not opine as to the likelihood that the restrictions and easements would be lifted; she merely observed that they were self-imposed.

[28] Although the question of a property's highest and best use is a factual one that we ordinarily will not disturb unless clearly erroneous, the court's implicit factual finding that the parking lot and tennis court properties could be sold as building lots lacks evidentiary support because there is nothing in the record to indicate that there is a reasonable probability that the easements and restrictions would be removed so as to permit building.

association's properties constitute valuable amenities, their value effectively has been transferred to those parties who are entitled to enjoy them by virtue of the easements and restrictions, namely, the individual owners within Breezy Knoll who constitute the association's membership. In other words, the assessments of the individual properties owned by the association's members should reflect the enhancement to the value of their properties attributable to the easements and restrictions.

Because the rule we apply today is compelled by a variety of considerations, we disagree with the town's argument that the question of whether to assess the value of the commonly used properties against either an association or its members is merely a semantic one. First, accounting for easements and restrictions by enhancing the value of the dominant property and reducing the value of servient property ensures that both properties are assessed on the basis of their true and actual values, as required by General Statutes § 12-64 (a). As previously noted; see footnote 22 of this opinion; the enhancement to a dominant property and the devaluation of a servient property caused by an easement are not necessarily equivalent. Second, in the present context, when value properly attributable to the homeowners' properties instead is attributed to association properties, it deprives the homeowners of the benefit of a deduction, for federal income tax purposes, of the property taxes the homeowners effectively are responsible for paying. See *Lake Monticello Assn.* v. *Ritter*, supra, 229 Va. 209–10; see also 6A P. Rohan, supra, § 14.02 [2] (Taxing common facilities separately "works a hardship on the participating homeowners [who would be ultimately paying the association's real estate taxes], because they would not be entitled to an income tax deduction for the real estate taxes paid by the association. Since the association is the record

owner of the real estate and the party paying the real estate levy, the constituent owners cannot deduct their pro rata share of the association's real estate tax."). Third, when property encumbered by easements is foreclosed upon and sold due to property tax delinquencies, the easements will be subject to extinguishment unless they have been assessed in connection with the properties to which they are appurtenant.[29] See 5 Restatement, supra, § 509 (2), comments (d) and (e); see also *Tax Lien Co.* v. *Schultze*, 213 N.Y. 9, 12, 106 N.E. 751 (1914), reh. denied, 213 N.Y. 700, 108 N.E. 1109 (1915).

We note finally that Connecticut municipalities, in taxing condominium developments and planned communities, are barred by statute from assessing common areas as separate properties, as Bigos did here. See General Statutes § 47-204 (b) (2). Condominium developments differ from Breezy Knoll in that their unit owners directly possess undivided interests in the community's common elements. See General Statutes § 47-202 (8). Planned communities, however, involve an ownership structure analogous to that of Breezy Knoll, i.e., individual units owned by residents and common elements owned by an association comprised of the unit owners. See General Statutes § 47-202 (3), (4) and (23). Most states have statutory provisions similar to Connecticut's, on the rationale that "[t]he theoretical value of the common areas or amenities to the units is taken into account within the assessed value of the units themselves." Vol. 1, Pt. 3, P. Rohan & M. Reskin,

---

[29] "Generally a sale of land for the nonpayment of a tax levied upon it gives to the purchaser only those interests in the land which were included in the valuation for the purpose of the tax." 5 Restatement, supra, § 567, comment (a). Accordingly, because the value of an easement is assessed in conjunction with the dominant estate, that easement will survive a foreclosure and sale of the servient estate for nonpayment of taxes. See 2 American Law of Property, supra, p. 310 ("a tax deed of the dominant tenement carries with it the easements appurtenant to it, while a tax deed of the servient tenement conveys it subject to the easements appurtenant to which it was previously subject").

Real Estate Transactions: Condominium Law and Practice (2007), § 36:03 [3], p. 36–10. The underlying appraisal theory is the same as that supporting our holding today: "[T]he common areas or common amenity packages have no value since they are either encumbered with easements or are otherwise reserved and restricted solely for the use of the individual condominium unit owners. Under this view, the value of the subservient lands (the common areas) is assumed into the value of the dominant easement parcel (the individual condominium units) by virtue of the condominium declaration." Id.

On the basis of the facts of this case and the foregoing analysis, we conclude that the trial court improperly concluded that the association had failed to show aggrievement due to overvaluation of its properties. Due to the extensive easements and restrictions burdening the association's properties, they should have been assessed at no more than nominal amounts, with their substantial inherent value instead being reflected in the assessments of the individual properties that benefit from the easements and restrictions.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.